# Illinois Official Reports

## Appellate Court

---

### *People v. Tetter*, **2018 IL App (3d) 150243**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KYLE J. TETTER, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-15-0243 |
| Filed<br>Modified upon<br>denial of rehearing | January 31, 2018<br><br>July 20, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Kankakee County, No. 13-CF-291; the Hon. Kathy Bradshaw-Elliott, Judge, presiding. |
| Judgment | Affirmed in part, reversed in part. |
| Counsel on Appeal | Michael J. Pelletier, Peter Carusona, and Mark D. Fisher, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>James R. Rowe II, State's Attorney, of Kankakee (Patrick Delfino, Lawrence M. Bauer, and Justin A. Nicolosi, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

Panel JUSTICE SCHMIDT delivered the judgment of the court, with opinion.
Justice Lytton concurred in the judgment and opinion.
Justice Wright concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1        Defendant, age 21 at the time, began a relationship with S.K. who represented herself to be 18. A jury found that defendant continued this relationship after learning S.K. was 16 and convicted him of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(d) (West 2012)). After his conviction, the trial court sentenced defendant to 180 days in county jail, 4 years' sex offender probation, and mandatory lifetime sex offender registration.

¶ 2        On appeal, defendant seeks a new trial; he alleges the trial court erred in admitting and publishing a voicemail recording during defendant's cross-examination. Defendant also raises, for the first time on appeal, a constitutional challenge claiming the Illinois Sex Offender Registration Act (SORA) (730 ILCS 150/1 *et seq.* (West 2012)), Sex Offender Community Notification Law (Notification Law) (730 ILCS 152/101 *et seq.* (West 2012)), residence and presence restrictions within 500 feet of school zones or 100 feet of school bus stops (720 ILCS 5/11-9.3 (West 2012)), residence and presence restrictions within 500 feet of a public park (*id.* § 11-9.4-1), mandatory annual driver's license renewal (730 ILCS 5/5-5-3(*o*) (West 2012)), and prohibiting defendant from petitioning to change his name (735 ILCS 5/21-101 (West 2012)) impose disproportionate punishment as applied to him. We refer to these statutes collectively as "sex offender statutes" herein.

¶ 3        We affirm the trial court's evidentiary ruling regarding the voicemail recording. However, we find that defendant's lifetime subjection to the sex offender statutes constitutes grossly disproportionate punishment as applied to him. The facts underlying defendant's conviction do not suggest that he is a dangerous sexual predator who must be banned from areas near schools or public parks, or who must be monitored by law enforcement authorities and presented to the public as a dangerous sexual predator.

¶ 4                                    FACTS

¶ 5        On July 12, 2013, the State charged defendant with aggravated criminal sexual abuse, a Class 2 felony (720 ILCS 5/11-1.60(d) (West 2012)). On October 4, 2013, defendant pled guilty in exchange for four years' sex offender probation and no jail time. On November 1, defendant submitted a motion to withdraw his guilty plea; he alleged that he did not know pleading guilty meant he would be subjected to the sex offender statutes' registration requirements and restrictions for life. Defendant's motion also alleged an affirmative defense—he reasonably believed S.K. to be 18 each time they had sex. The trial court granted defendant's motion on December 20. Defendant's trial began on January 13, 2015.

¶ 6        Sixteen-year-old S.K. testified that she registered for a social networking website called "MeetMe" sometime after July 2012. S.K.'s MeetMe profile represented to other users that she was 18. Defendant was 21 when she "met" him on MeetMe.

¶ 7        Defendant and S.K. also communicated through another online application called "Kik." They met in person for the first time in November 2012. Defendant picked S.K. up at her high school and took her home. Defendant asked S.K. to be his girlfriend, and she agreed.

¶ 8        They began having consensual sex in defendant's car after a few meetings in November 2012. Although she could not remember the date, S.K. testified that she and defendant had sex once at her house when her parents were away; she did not consent to this sexual encounter.

¶ 9        Sometime in January or February 2013, S.K. left defendant a voicemail wherein she referred to herself as "a stupid 16-year-old." She left the voicemail after learning that defendant still communicated with his ex-fiancée. S.K. testified that defendant responded to this voicemail with a text message, but she could not recall the substance of the message.

¶ 10       On March 26, 2013, S.K. ran away from home. She testified that she argued with her parents about photographs on her phone that she sent to defendant. Her parents confiscated her phone, and her mother told her to leave the house. S.K. then called defendant from Kmart to tell him she ran away. Police picked her up from the Kmart after she spoke with defendant.

¶ 11       S.K. stated she and defendant had sex several times between March 26 and late April 2013. On June 8, 2013, an ultrasound confirmed that S.K. was approximately two months pregnant. When she informed defendant that she was pregnant, he asked her to choose him or the baby—her daughter was born December 31, 2013.

¶ 12       S.K.'s mother testified that she learned defendant was 21 after S.K. began meeting with him in November 2012. S.K.'s parents did not want her dating until she turned 18 and forbade her from having a relationship with defendant.

¶ 13       In December 2012, S.K.'s mother accompanied her to a local mall where she rang bells for the Salvation Army. When defendant arrived to see S.K., her mother confronted him. She informed defendant that her daughter was 16 and threatened to "ruin" him if he touched her. S.K.'s mother reported defendant to the police soon after learning S.K. was pregnant in June 2013.

¶ 14       Detective Robert Mason testified that he arrested defendant on July 2, 2013. Defendant voluntarily turned over his cell phone and agreed to videotape his interview at the police station. Mason sent defendant's cell phone to the United States Secret Service Chicago Electronic Crimes Division (Secret Service) for forensic analysis. The Secret Service provided Mason with a thumb drive containing the evidence from defendant's phone. The trial court admitted the thumb drive into evidence, and the jury viewed defendant's videotaped interview.

¶ 15       During the interview, defendant stated that he believed S.K. was 18 based upon her MeetMe profile representation. He denied ever picking S.K. up from school; he claimed that they always met at a Subway restaurant. Defendant estimated that he and S.K. had sex approximately five or six times—always consensual and never at her house. He admitted to having sex with S.K. once after he learned that she was 16.

¶ 16       At trial, defendant testified on his own behalf. He stated that he lied about having sex with S.K. after learning her age during the police interview because he was scared and disoriented. He claimed that he never knew S.K. was 16 until he spoke with police on March 26, 2013. He never had sex with S.K. thereafter.

¶ 17       During cross-examination, the State played the February 2013 voicemail recording in which S.K. referred to herself as "a stupid 16-year-old." Defendant objected to the recording; he alleged the State failed to establish proper foundation. The State pointed out that S.K.

testified during the prosecution's case-in-chief that she left the voicemail on defendant's phone. The State also assured the trial court that S.K. and Detective Mason would provide additional foundation on rebuttal. The trial court allowed the State to play the recording.

¶ 18    S.K. and Detective Mason testified during the prosecution's rebuttal. S.K. heard the recording during defendant's cross-examination; she identified her voice and confirmed that the recording accurately portrayed the voicemail she left on defendant's phone. She stated that she left the voicemail after an orchestra concert in February 2013. Although Mason identified the Secret Service thumb drive, he could not identify the Secret Service's methods used to extract defendant's cell phone information or verify the thumb drive's contents.

¶ 19    At the close of evidence, defense counsel moved for a mistrial. He alleged that the State failed to establish adequate foundation for the voicemail before or after playing it during defendant's cross-examination. Although S.K. identified her voice and verified that she left the voicemail on defendant's phone, defense counsel argued that the State failed to prove that the information on the thumb drive, including the voicemail, came from defendant's phone. The trial court denied the motion. The jury found defendant guilty.

¶ 20    At the sentencing hearing, the trial court heard and denied defendant's posttrial motion. Defendant's presentence report showed that he had no prior criminal convictions, other than minor traffic violations. The presentence report also contained defendant's sex offender psychological evaluation. The Kankakee County court referred defendant to Dr. Simone, a licensed clinical psychologist, for the evaluation. Simone determined that defendant presented a low risk to reoffend and recommended outpatient sex offender counseling. During the evaluation, defendant placed in the zero percentile (virtually no risk) on the child molestation scale, drug use scale, and alcoholism scale.

¶ 21    The trial court sentenced defendant to 180 days in county jail, 4 years' sex offender probation, and lifetime subjection to the sex offender statutes' registration and restrictions. After sentencing, defendant asked the trial court to prepare a notice of appeal and to appoint appellate counsel; the court agreed. Due to an administrative error, the deputy circuit clerk filed defendant's notice of appeal on April 13, 2015, well after the filing deadline. The clerk attached a letter asking this court to allow the late notice. On September 8, 2015, we allowed an agreed motion to treat the notice as timely and assumed jurisdiction over this appeal.

¶ 22                                    ANALYSIS

¶ 23    Defendant's appeal raises two distinct claims and seeks two separate forms of relief. First, he argues that the trial court abused its discretion by allowing the State to play S.K.'s voicemail during defendant's cross-examination. He claims that this error warrants a new trial. Second, defendant makes an as-applied constitutional challenge against the sex offender statutes. He argues that the sex offender statutes' requirements and restrictions, as applied to him, constitute disproportionate punishment under both the Illinois Constitution and United States Constitution. We address each issue separately below.

¶ 24                    I. Authentication of the Voicemail Recording

¶ 25    Defendant asserts that he was denied a fair trial when the trial court allowed the State to play S.K.'s voicemail during his cross-examination. He argues the State failed to establish proper foundation before or after playing the recording. Defendant claims the State needed to

present independent evidence to prove the thumb drive's contents, including the voicemail, came from his phone.

¶ 26    The jury's verdict hinged on whether defendant reasonably believed S.K. was 18 during each sexual encounter. Conflicting testimony rendered witnesses' credibility key to this issue. Defendant claims that the court's erroneous admission and publication of the voicemail unfairly influenced the jury's verdict and tainted the trial.

¶ 27    The State argues that S.K.'s testimony established sufficient foundation for the voicemail when she identified her voice in the recording and testified that the recording was the voicemail she left on defendant's phone in February 2013. In the alternative, the State argues that any error was harmless. According to the State, other evidence and testimony proved defendant either knew S.K. was 16 prior to March 26, 2013, or had sex with her thereafter.

¶ 28    The trial court exercises its sound discretion in admitting evidence; the court's judgment will not be reversed absent an abuse of this discretion. *People v. Taylor*, 2011 IL 110067, ¶ 27. A trial court abuses its discretion when its judgment is "fanciful, unreasonable or when no reasonable person would adopt the trial court's view." *Id.*

¶ 29    As with any evidence, the party seeking admission of an audiotape must establish an adequate foundation. *People v. Williams*, 109 Ill. 2d 327, 338 (1985). The party establishes sufficient foundation when "a witness to the conversation recorded on the tape *** testifies that the tape, as it exists in court, accurately portrays the conversation in question." *Id.*; see also *People v. Johnson*, 2016 IL App (4th) 150004, ¶¶ 66-67. The Illinois Rules of Evidence state that evidence is authenticated where a witness with knowledge testifies that "a matter is what it is claimed to be." Ill. R. Evid. 901(b)(1) (eff. Jan. 1, 2011).

¶ 30    If no witness with personal knowledge is available, parties may authenticate recordings under the silent witness theory "if there is sufficient proof of the reliability of the process that produced the photograph or videotape." *People v. Vaden*, 336 Ill. App. 3d 893, 898 (2003). This method of authentication is available only *when no party to the conversation testifies to the accuracy of the recording*.

¶ 31    The crux of defendant's argument is "that there was no evidence that the recording was actually retrieved from defendant's phone." He argues that the State could not establish "who recorded the message, when it was recorded, where it was recorded, or what was done with the recording since it was made. *** For all we know, the recording was made of [S.K.'s] voice the day before trial began."

¶ 32    This argument champions the standard used under the silent witness theory. However, S.K. testified that the recording accurately reproduced the message she left on defendant's phone:

> "Q. [S.K.], you were in the courtroom when I played an audio recording, is that correct?
>
> A. Yes, ma'am.
>
> Q. Did you recognize that audio recording?
>
> A. Yes.
>
> Q. And what did you recognize that to be?
>
> A. It was a conversation that me and [defendant] had via text that was an argument. He stopped responding to me so I had called him.
>
> Q. Okay. So what we heard was—who was the voice on the recording that we heard?

A. Me.

Q. Okay. And did you tell that directly to [defendant] or what did—how did that message get to [defendant]?

A. I just had called his cell phone and had left the message. It was directly—it was directed towards him.

Q. Okay. But it was on his voicemail?

A. Yes ma'am.

Q. Okay. And do you have any indication from [defendant] that he ever listened to it?

A. He had responded shortly thereafter via text.

\*\*\*

Q. And do you recall when that conversation was—or when that voicemail was that you left him?

A. It would have been in February. I believe it was shortly after like an orchestra concert I had had and he was talking about the fact that his ex-fiancée had made a Facebook post regarding the fact that he had come to a high school orchestra.

Q. Okay. And that would be—that would have been February of what year?

A. Of 2013."

¶ 33    This testimony established adequate foundation for the recording. S.K. identified her own voice and stated that she left the voicemail on defendant's phone in February 2013. Defense counsel was free to challenge the thumb drive's source or S.K.'s credibility, but such impeachment would attack the voicemail's evidentiary weight, not its admissibility. Once S.K. identified her voice and provided context to the recording, it was admissible.

¶ 34    We hold that the trial court did not abuse its discretion by allowing the State to play the recording during defendant's cross-examination. We need not address the State's alternative harmless error argument. However, we note that during his police interview, defendant admitted that he had sex with S.K. once after learning her age. S.K. and her mother also testified that defendant knew S.K.'s age as early as December 2012. The State did not rely solely on the voicemail to prove defendant's guilt.

¶ 35                    II. Constitutionality of Illinois Sex Offender Statutes
                                        as Applied to Defendant

¶ 36    Before addressing this claim's merits, we must address the State's position that defendant forfeited the claim when he failed to raise it with the trial court. Constitutional challenges may be raised at any time, including for the first time on appeal. *People v. McCarty*, 223 Ill. 2d 109, 123 (2006); *In re J.W.*, 204 Ill. 2d 50, 61-62 (2003). The State argues that as-applied constitutional challenges may not be raised on appeal absent an evidentiary hearing in the trial court. However, a panel of this court has held, as have several of our sister appellate districts, that as-applied constitutional challenges are not forfeited when defendants fail to raise them at trial or in a posttrial motion. *People v. Cleary*, 2013 IL App (3d) 110610, ¶ 35; *People v. Burnett*, 2015 IL App (1st) 133610, ¶¶ 81-82; *People v. Emmett*, 264 Ill. App. 3d 296, 297 (1994).

¶ 37    The State mistakenly relies upon *Reno v. Flores*, 507 U.S. 292 (1993). In *Flores*, the Immigration and Naturalization Service (INS) regulation at issue (8 C.F.R. § 242.24 (1992)) did not exist when the class filed the lawsuit; the regulation's effect lasted one week before the district court deemed it unconstitutional. The Court observed that the class could present only a facial challenge, not an as-applied one: "We have before us no findings of fact, indeed no record, concerning the INS's interpretation of the regulation or the history of its enforcement. We have only the regulation itself and the statement of basis and purpose that accompanied its promulgation." *Flores*, 507 U.S. at 300-01. *Flores* does not require trial courts nationwide to hear and make fact findings for every as-applied constitutional challenge to avoid forfeiture. The Court's opinion merely recognizes that such challenges must be supported by the record. Here, defendant's challenge addresses statutes that apply to him by virtue of his conviction. The appellate record includes trial evidence, the presentence investigation, his sex offender evaluation, the parties' pleadings, and trial transcripts. This record provides sufficient basis to review defendant's challenge. We now turn to the merits.

¶ 38    Defendant asserts that his subjection to the sex offender statutes violates the United States Constitution's prohibition against cruel and unusual punishment (U.S. Const., amend. VIII) and the Illinois Constitution's proportionate penalties clause (Ill. Const. 1970, art. I, § 11) as applied to him. A panel of this court recently held banning sex offenders from public parks (720 ILCS 5/11-9.4-1 (West 2012)) to be facially unconstitutional. *People v. Pepitone*, 2017 IL App (3d) 140627. The majority held that the statute was not rationally related to its legislative purpose, protecting the public from dangerous sexual predators. *Id.* ¶ 24. Although its constitutionality is not dispositive to the issue presented here, the public parks statute is relevant to defendant's challenge. Our supreme court has not yet decided *Pepitone*. For purposes of this appeal, we assume the statute is facially constitutional.

¶ 39    Like with the Illinois Constitution's proportionate penalties clause, "[t]he concept of proportionality is central to the Eighth Amendment." *Graham v. Florida*, 560 U.S. 48, 59 (2010). "Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' " *Id.* (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)). To constitute disproportionate punishment, however, defendant's subjection to the sex offender statutes must constitute punishment under the law.

¶ 40                    A. Whether Sex Offender Statutes Constitute Punishment

¶ 41    Our first question is whether the sex offender statutes are punitive or regulatory. *Smith v. Doe*, 538 U.S. 84, 92 (2003); *In re Rodney H.*, 223 Ill. 2d 510, 518 (2006). Courts employ a two-step framework to determine whether a statutory scheme is punitive. The first step "ascertain[s] whether the legislature meant the statute to establish 'civil' proceedings." *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997). If the legislature intended to impose punishment, then the second step is unnecessary. However, if the legislature intended to enact a civil regulatory scheme, the second step determines whether the scheme is " 'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.' " *Id.* (quoting *United States v. Ward*, 448 U.S. 242, 248-49 (1980)).

¶ 42    During the second step's analysis, courts use as "useful guideposts" the factors set forth in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963). See *Hudson v. United States*, 522 U.S. 93, 99 (1997). The *Mendoza-Martinez* factors relevant to the sex offender statutes are

(1) whether the sanction involves affirmative disability or restraint, (2) whether it has been historically regarded as punishment, (3) whether its operation will promote the traditional aims of punishment, (4) whether the sanction is rationally related to an alternative, nonpunitive purpose, and (5) whether it appears excessive in relation to the alternative, nonpunitive purpose. *Mendoza-Martinez*, 372 U.S. at 168-69; *Smith*, 538 U.S. at 97.

¶ 43    Our supreme court previously determined that the sex offender statutes do not constitute punishment. *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 206-07 (2009); *People v. Malchow*, 193 Ill. 2d 413, 424 (2000). *Konetski* addressed juvenile sex offender registration requirements, which allow juvenile offenders to petition for removal after five years—here, defendant has no such right. In *Malchow*, the court held that the Notification Law, as it existed in 1998, placed no affirmative disability or restraint on sex offenders; their movements and activities were in no way restricted. *Malchow*, 193 Ill. 2d at 421. The court also noted that SORA's requirements terminated for "most offenders" after 10 years. *Id.* at 424. The court concluded that "the legislature has [not] chosen excessive measures to implement its goal of protecting the public from sex offenders." *Id.*

¶ 44    After *Malchow*, the United States Supreme Court held that Alaska's sex offender registration act (Alaska's SORA) (Alaska Stat. § 12.63.010 *et seq.* (2000)) did not constitute punishment in *Smith*. The *Smith* majority found that Alaska's SORA merely disseminated "accurate information about a criminal record, most of which [was] already public." *Smith*, 538 U.S. at 98. The Court disagreed with the appellate court's opinion that Alaska's SORA equated to probation or parole, although the majority acknowledged that the argument had "some force." *Id.* at 101. The majority reasoned:

> "Probation and supervised release entail a series of mandatory conditions and allow the supervising officer to seek the revocation of probation or release in case of infraction. [Citations.] By contrast, offenders subject to the Alaska statute *are free to move where they wish and to live and work as other citizens, with no supervision*." (Emphasis added.) *Id.*

¶ 45    Our legislature subsequently passed numerous amendments imposing additional requirements and restrictions upon sex offenders. Most importantly, it imposed specific restrictions on where sex offenders may be present or live. See 720 ILCS 5/11-9.3, 11-9.4-1 (West 2012). Sex offenders cannot have jobs where they work, at any time for any reason, within 500 feet of a school or public park or within 100 feet of a school bus stop. *Id.* SORA also effectively bars offenders from working any job requiring extensive travel; sex offenders must notify, in person, both Illinois law enforcement and the destination's law enforcement when they are away from home for three or more days. 730 ILCS 150/3(a) (West 2012). The amendments since *Malchow* "directly restrict where [a sex offender] can live, work, and even move about his community." *People v. Avila-Briones*, 2015 IL App (1st) 132221, ¶ 51. Thus, we are faced with very different and more restrictive statutes than those addressed in *Malchow* or *Smith*.

¶ 46    In *Malchow*, our supreme court held that the Notification Law, on its face, reflects the legislature's intention to create a civil regulatory scheme that protects the public rather than a punitive scheme. *Malchow*, 193 Ill. 2d at 420; see also *Hendricks*, 521 U.S. at 361. However, since the legislature enacted sex offender statutes that restrict a convicted sex offender's presence, residence, and liberty to move about society, the court has not addressed whether the sex offender statutes' punitive effects negate the legislature's intent to deem the laws civil. See

*Hendricks*, 521 U.S. at 361. For the reasons stated below, we find that they do.

¶ 47                                1. Affirmative Disability or Restraint

¶ 48      Both *Malchow* and *Smith* found that the 1998 Illinois Notification Law and Alaska's SORA, respectively, did not affirmatively disable or restrain offenders because they were free to live, work, and move about the community without restriction. Since *Malchow* and *Smith*, amendments to the sex offender statutes have stripped this freedom of movement from Illinois offenders. The sex offender statutes are now akin to probation or supervised release. Probation and other forms of supervised release are considered punishment. *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) ("Probation is simply one point (or, more accurately, one set of points) on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service.").

¶ 49      Non-sex-offender parolees are subject to parole conditions. Parolees must, among other conditions, not break the law in any jurisdiction; not possess a firearm or dangerous weapon; report to an agent of the Illinois Department of Corrections (DOC); permit a DOC agent to visit the parolee at home or place of employment; attend or reside in a facility established for the instruction or residence of persons on parole or mandatory supervised release (MSR); obtain the DOC's permission before leaving the state; obtain permission before changing residence or employment; consent to searches of the parolee's person, property, or residence; refrain from using narcotics and submit to urinalysis testing; not frequent places where controlled substances are illegally sold or used; not knowingly associate with others on MSR or parole; provide true and accurate information regarding the parolee's community integration and adjustment; and follow the parole agent's instructions. See 730 ILCS 5/3-3-7(a) (West 2014). Parolees may additionally be required to work, pursue education or vocational training, undergo treatment for medical issues or addiction, and/or support the parolee's dependents. 730 ILCS 5/3-3-7(b) (West 2012).

¶ 50      Sex offenders, like defendant, are subject to dozens of additional parole conditions. See 730 ILCS 5/3-3-7(a)(7.5)-(7.13), (b)(7.5)-(7.6), (b-1) (West 2014). These conditions include sex offender treatment, not living in the same residential unit (including apartments or condominiums) with other known sex offenders, wearing an electronic monitoring device, not communicating with or contacting people on the Internet whom the offender believes to be under 18, consenting to searches of all devices with Internet access, not possessing prescription medications for erectile dysfunction, not "scrubbing" or erasing data on any computer device, residing only at an approved location, obtaining approval prior to accepting employment or pursuing education, not being employed or participating in any volunteer activity involving contact with children, refraining from entering designated geographic areas without approval, neither possessing nor having access to pornography or sexually stimulating material, not patronizing any adult entertainment establishment or telephone hotline, not residing near or being present in places where minors may congregate without advance approval, taking an annual polygraph exam, maintaining a travel log, and other restrictions. See *id.*

¶ 51      After completing sex offender probation, offenders are subject to the sex offender statutes for either 10 years or life—defendant's conviction subjects him to lifetime registration. Under the sex offender statutes, off-parole sex offenders must register with the DOC, inform the DOC of certain life events (such as buying or using a new car, growing a beard, moving, or taking a vacation), consent to having Internet usage monitored, and most importantly, not live or be

- 9 -

present near school zones, school bus stops, or public parks. Off-parole sex offenders are *more* restricted in many ways than non-sex-offender parolees. While non-sex-offender parolees are monitored and prohibited from committing crimes, off-parole sex offenders may not reside or be present near places where the legislature has deemed them *more likely* to recidivate.

¶ 52     Sex offender statutes restrict where defendant may live, work, or be present, in addition to the numerous obstacles imposed by the registration requirements. These requirements and restrictions, collectively, constitute an affirmative disability and restraint—defendant is restricted in most aspects of his daily life. Specifically, "safe zones" surrounding schools, school bus stops, and public parks, significantly restrict defendant's lawful movement within the community. These zones restrict where he may live, drive, work, visit, or attend any social function for life. Although not to the same degree as prison, the sex offender statutes' restrictions affirmatively disable and restrain offenders such as defendant. Therefore, this factor suggests that the sex offender statutes constitute punishment.

¶ 53                       2. History and Tradition as Punishment

¶ 54     The *Smith* majority found that Alaska's SORA did not resemble a historically recognized form of punishment—it merely disseminated accurate, already-public information. *Smith*, 538 U.S. at 97-99. More recently, the Sixth Circuit Court of Appeals has found Michigan's Sex Offenders Registration Act (Michigan's SORA) (Mich. Comp. Laws § 28.723 *et seq.* (2012)) to meet "the general definition of punishment, [have] much in common with banishment and public shaming, and [have] a number of similarities to parole/probation." *Does #1-5 v. Snyder*, 834 F.3d 696, 703 (6th Cir. 2016), *cert. denied*, 583 U.S. ___, 138 S. Ct. 55 (2017). The *Snyder* court primarily focused on Michigan's SORA's 1000-foot school safety zone restriction; sex offenders were not allowed to live, work, or "loiter" within 1000 feet of any school. *Id.* at 698, 702. The court found this restriction punitive, concluding that it drastically hindered offenders' ability to live in or move about society. *Id.* at 702. The court also found that Michigan's SORA went far beyond publishing already-public information, like Alaska's SORA in *Smith*. *Id.* Instead, Michigan's SORA set forth a nonappealable "byzantine code" in which "the ignominy *** flows not only from the past offense, but also from the statute itself." *Id.* at 697, 703.

¶ 55     Our current sex offender statutes are more similar to Michigan's SORA addressed in *Snyder* than Alaska's SORA in *Smith* or our 1998 Notification Law in *Malchow*. Arguably, our current sex offender statutes are more restrictive than Michigan's SORA deemed punishment in *Snyder*. Although Michigan's SORA imposed larger school safety zones than our sex offender statutes (1000 feet as opposed to 500 feet), our sex offender statutes impose a 500-foot zone around public parks and a 100-feet zone around school bus stops that Michigan's SORA did not impose. Michigan's SORA did not "prohibit the registrant from setting foot in the school zones." *Id.* at 701. Our sex offender statutes do. 720 ILCS 5/11-9.3, 11-9.4-1 (West 2012).

¶ 56     Our sex offender statutes satisfy the traditional definition of punishment. Citing published legal philosophy, the *Snyder* court defined "punishment" as involving pain or unpleasant consequences following from an offense against the law, applying to the offender, being intentionally administered by people other than the offender, and being imposed and administered by an authority constituted by a legal system against which the offense was committed. *Snyder*, 834 F.3d at 701 (citing H.L.A. Hart, Punishment and Responsibility: Essays in the Philosophy of Law 4-5 (1968)). Our sex offender statutes, like parole or MSR,

satisfy this definition. We find that this factor also suggests that the sex offender statutes constitute punishment.

¶ 57                                3. Traditional Aims of Punishment

¶ 58     The traditional aims of punishment are incapacitation, retribution, and deterrence. Our legislature implemented the sex offender statutes to deter future sex crimes and protect the public. If the sex offender statutes are not meant to deter sex crimes, then they do not protect the public at all. As the Court noted in *Smith*, however, civil regulations can deter crime: "To hold that the mere presence of a deterrent purpose renders such sanctions criminal *** would severely undermine the Government's ability to engage in effective regulation." (Internal quotation marks omitted.) *Smith*, 538 U.S. at 102. A statute that deters crime is not necessarily punitive.

¶ 59     Our sex offender statutes do not merely deter recidivism; they incapacitate convicted sex offenders and serve as retribution for sex crimes committed. The sex offender statutes' residence and presence restrictions, at work or otherwise, incapacitate sex offenders by banning them from places where children routinely congregate. Restricting offenders' liberty of residence and movement, as well as monitoring their daily lives solely because of certain convictions, emits a strong scent of retribution, for better or worse. In sum, our sex offender statutes satisfy all three traditional aims of punishment. We find that this factor suggests that the sex offender statutes constitute punishment.

¶ 60                          4. Rational Relation to a Nonpunitive Purpose
                                      and Excessive Application

¶ 61     We assess the final two *Mendoza-Martinez* factors relevant to sex crimes in tandem. These factors instruct us to determine whether the sex offender statutes' restrictions are rationally related to their nonpunitive purpose of protecting the public and, if so, whether the application of the sex offender statutes is excessive with respect to serving its nonpunitive purpose.

¶ 62     *Smith* held that Alaska's SORA was rationally related to protecting the public from sex offenders, a nonpunitive regulatory purpose, primarily due to their high risk of recidivism. *Id.* at 102-04. The Court cited research on child molesters, which noted a high recidivism rate and concluded that most offenders reoffend more than a few years after their prison terms, sometimes as many as 20 years after release. *Id.* at 104. The Court also found the application of Alaska's SORA to be reasonable in light of its nonpunitive objective. *Id.* at 103-04.

¶ 63     In his concurrence, Justice Souter questioned whether Alaska's SORA's excessive application undermined its nonpunitive purpose. He observed that not all sex offenders threaten public safety and "when a legislature uses prior convictions to impose burdens that outpace the law's stated civil aims, there is room for serious argument that the ulterior purpose is to revisit past crimes, not prevent future ones." *Id.* at 109 (Souter, J., concurring in the judgment).

¶ 64     Here, even if the sex offender statutes are rationally related to a nonpunitive purpose, their broad application and harsh liberty restrictions extend far beyond the purpose's purview. To determine whether a statute's application is excessive with respect to its nonpunitive purpose, "[t]he question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Id.* at 105 (majority opinion). In light of its nonpunitive purpose,

protecting the public from dangerous sex offenders, the sex offender statutes' scope and substance is unreasonably punitive.

¶ 65    Our sex offender statutes, unlike Alaska's SORA in *Smith*, restrict all sex offenders' (not just dangerous ones') liberty of movement in society. Although we must not question "whether the legislature has made the best choice possible to address the problem it seeks to remedy" (*id.*), we must recognize, as did the *Smith* majority, that restricting one's liberty of movement in the community is drastically different than disseminating information. See *id.* at 101.

¶ 66    The sex offender statutes' broad application also greatly exceeds their nonpunitive purpose. The *Snyder* court found that indiscriminate restrictions on sex offenders' residence or presence in certain areas have, "at best, no impact on recidivism" because Michigan's SORA made "no provision for individualized assessments of proclivities or dangerousness, even though the danger to children posed by some *** is doubtless far less than that posed by a serial child molester." *Snyder*, 834 F.3d at 705. Likewise, our sex offender statutes' scope and restrictions substantially outpace their public safety objective. Illinois individually evaluates sex offenders (including defendant) to determine their risk to recidivate, yet the application of the sex offender statutes does not account for these individual evaluations. The trial court referred defendant to a licensed clinical psychologist for his evaluation. Defendant scored in the zero percentile on the child molestation, drug abuse, and alcoholism scales. In other words, a clinical psychologist chosen by the court, not defendant, concluded that he poses no greater risk than any other person to commit child sex crimes or those involving drug or alcohol abuse. Nonetheless, the sex offender statutes require defendant to register for life and not set foot near school zones or public parks where children frequently congregate.

¶ 67    Defendant is simply not the person at whom the sex offender statutes' purposes are aimed. Its statutes are not tailored to regulate only dangerous offenders, those likely to recidivate, or those with little or no potential for rehabilitation; therefore, offenders like defendant must endure the statutes' restrictions without society reaping any benefit. These statutes go well beyond the dissemination of accurate, already-public information and are not "analogous to a visit to an official archive of criminal records." *Smith*, 538 U.S. at 99. We agree with the trial court's assessment of defendant's sentence:

> "I can only say his life will never be the same. He will go through life now as a predator. He will be labeled a predator in every way. He—it will be very difficult to get a job. He'll not be able to have a cell phone, use those apps that he uses or be on the Internet. He won't be able to live where he wants to live. He won't be able to associate with who he wants to be [*sic*]. His life will—will never be the same and—and in effect that is great punishment."

¶ 68    If the sex offender statutes' application were not *irrevocable*, our analysis might be different. See *Konetski*, 233 Ill. 2d at 203 (finding that a juvenile offender's ability to petition for termination after five years was indicative of a nonpunitive restriction). In a similar case, New Hampshire's supreme court fashioned a remedy whereby sex offenders were entitled to periodic hearings, subject to judicial review, to determine whether they still posed a danger to society. *Doe v. State*, 111 A.3d 1077, 1101-02 (N.H. 2015). Such opportunities for sex offenders to be exonerated from the sex offender statutes' restrictions better reflect a nonpunitive regulatory scheme rather than punishment for a crime.

¶ 69    Although the sex offender statutes' restrictions may present fair and just punishment in many or most cases, they nonetheless constitute punishment. Most notably, sex offender

statutes punish sex offenders by restricting their liberty to live where they wish and move about the community. The sex offender statutes' liberty restrictions fall within the "continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service." See *Griffin*, 483 U.S. at 874. Several other states have found that sex offender registration statutes constitute punishment. See *Doe v. Department of Public Safety & Correctional Services*, 62 A.3d 123 (Md. 2013); *Gonzalez v. State*, 980 N.E.2d 312, 321 (Ind. 2013); *Starkey v. Oklahoma Department of Corrections*, 2013 OK 43, 305 P.3d 1004; *State v. Letalien*, 2009 ME 130, 985 A.2d 4; *State v. Williams*, 129 Ohio St. 3d 344, 2011-Ohio-3374, 952 N.E.2d 1108; *Commonwealth v. Baker*, 295 S.W.3d 437 (Ky. 2009). We find that the sex offender statutes constitute punishment as contemplated by the eighth amendment and the Illinois Constitution's disproportionate penalties clause. We do not address other potential constitutional applications or arguments; our holding addresses only the issues raised by defendant's as-applied challenge. We now address whether defendant's punishment is unconstitutionally disproportionate to his crime.

¶ 70                     B. Whether Defendant's Punishment Is Disproportionate

¶ 71    Article I, section 11, of the Illinois Constitution provides, "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "A proportionality challenge contends that the penalty in question was not determined according to the seriousness of the offense ***." *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). Our proportionate penalties clause coincides with the eighth amendment. *Id.* at 517 (citing *People v. McDonald*, 168 Ill. 2d 420, 455 (1995)).

¶ 72    The eighth amendment allows defendants to challenge sentences as disproportionate "given all the circumstances in a particular case." *Graham*, 560 U.S. at 59. Courts must consider "all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive." *Id.* In doing so, courts must be mindful that the eighth amendment contains a " 'narrow proportionality principle, that does not require strict proportionality between crime and sentence but rather forbids only extreme sentences that are grossly disproportionate to the crime.' " (Internal quotation marks omitted.) *Id.* at 59-60 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 997, 1000-01 (1991) (Kennedy, J., concurring in part and concurring in the judgment, joined by O'Connor and Souter, JJ.)).

¶ 73    The long-recognized eighth amendment proportionality principle applies to all punishments, including both capital and noncapital sentences. See *Coker v. Georgia*, 433 U.S. 584, 592 (1977); *Rummel v. Estelle*, 445 U.S. 263, 271-74 (1980). Although the Court recognizes that it has not established "a clear or consistent path for courts to follow" (*Lockyer v. Andrade*, 538 U.S. 63, 72 (2003)), it has remained resolute in its prohibition of grossly disproportionate punishments. See *id.* We find that the instant case, as a matter of first impression, lends itself to the three-factor inquiry set forth in *Solem v. Helm*, 463 U.S. 277, 290-92 (1983). Particularly relevant to this case are the first two factors (1) whether the gravity of the offense comports with the harshness of the penalty and (2) whether "more serious crimes are subject to the same penalty, or to less serious penalties" as an indication that the punishment is excessive. *Id.* at 290-91. The third factor that courts "may find *** useful" (*id.* at 291), comparing other jurisdictions' punishments for the same crime, has little or no value in

this case; the sex offender statutes' restrictions and offenders' prison sentences vary, sometimes dramatically, by state.

¶ 74 First, we must determine the gravity of defendant's crime in relation to the sex offender statutes' restrictions. Certainly, the sex offender statutes' restrictions are less severe than a prison sentence; nonetheless, they can be grossly disproportionate, especially viewing them in correlation with defendant's jail sentence and sex offender probation term. Defendant also must bear the sex offender statutes' restrictions for life. In many ways, these restrictions will prevent defendant from reestablishing himself in society and permanently impact his life.

¶ 75 To assess the gravity of defendant's offense, we first turn to the crime's classification in the Criminal Code of 2012. Section 11-1.60 renders defendant's crime a Class 2 felony. 720 ILCS 5/11-1.60(g) (West 2012). Many other sex crimes are more serious Class 1 felonies or Class X felonies (*id.* §§ 11-1.20, 11-1.30, 11-1.40). Some others are less serious Class A misdemeanors or Class 4 felonies (*id.* § 11-1.50). Class 2 felonies are punishable by three to seven years' imprisonment (730 ILCS 5/5-4.5-35 (West 2014)), but the trial court sentenced defendant to 180 days in jail, 4 years of sex offender probation, and lifetime SORA registration. Apparently, the court determined that the circumstances underlying defendant's conviction did not warrant the statutory minimum; nor did the State seek a writ of *mandamus* to increase defendant's sentence. It seems everyone below agrees that defendant is not sexually dangerous, to children or anyone else.

¶ 76 We cannot accurately assess a sex crime's gravity without considering the risk of recidivism. Recidivism concerns are legitimate considerations in determining whether a sentence is grossly disproportionate. See *Ewing v. California*, 538 U.S. 11, 24-28 (2003). In fact, the purpose of the sex offender statutes' registration and restrictions nationwide is to limit the risk of recidivism. Perhaps these concerns are most accurately personified in *United States v. Williams*, 636 F.3d 1229 (9th Cir. 2011). Williams was convicted of possessing child pornography after previously sexually assaulting two girls under 13 years old. After his convictions, Williams worked at a local fair where children would be present; he admitted during his psychological evaluation that he had sexual fantasies about raping young children. The Ninth Circuit found Williams's lifetime of supervised release proportional to his crime due to his high risk of recidivism and glaring lack of rehabilitation. *Id.* at 1232-34. We agree with the Ninth Circuit's rationale and opinion.

¶ 77 Defendant here is not Williams. Defendant was 21 and initially believed S.K. to be 18, according to her MeetMe profile—no trial evidence suggested defendant intentionally preyed upon underage girls. Defendant and S.K. had a relationship. While this relationship resulted in defendant's illegal conduct for which he was convicted, these facts share little or no common ground with *Williams* or other cases involving violent sex crimes or child molestation. After his arrest, defendant's evaluation placed him at virtually zero risk to recidivate. He had no prior criminal offenses, other than minor traffic tickets. In fact, the trial judge sentenced him to far less prison time than the minimum Class 2 felony term. The circumstances underlying defendant's conviction, along with his evaluation, suggest that his lifetime subjection to the sex offender statutes' registration and restrictions, on top of his jail sentence and sex offender probation period, is grossly disproportionate to the crime for which he was convicted.

¶ 78 Defendant's argument is further bolstered when we compare his punishment to others in Illinois. A chasm of culpability and community concern lies between defendant and violent sex offenders or serial child molesters. Violent sex crimes and child sex crimes are classified as

more serious Class 1 or Class X felonies in Illinois. 720 ILCS 5/11-1.20, 11-1.30, 11-1.40 (West 2012). Nonetheless, defendant is forever restricted as to where he can live, work, and move about the community, no differently than offenders fitting a far more dangerous criminal profile.

¶ 79 Additionally, the sex offender statutes' restrictions apply to defendant no differently than offenders deemed a high risk to recidivate. The State initially offered defendant a plea agreement in which he would be subject to the sex offender statutes for life but serve no jail time. We hope that the State does not rely solely upon the sex offender statutes' restrictions to protect the public from dangerous sex offenders. We build and maintain prisons to incarcerate dangerous criminals; we should not delegate public protection to citizens by giving them access to a registry and wishing them luck. Furthermore, if a sex offender is so potentially dangerous as to require the sex offender statutes' restrictions at issue here, we question the wisdom of releasing the offender at all. We have procedures available under the Sexually Dangerous Persons Act (725 ILCS 205/0.01 *et seq.* (West 2012)) and Sexually Violent Persons Commitment Act (725 ILCS 207/1 *et seq.* (West 2012)) to keep dangerous sex offenders where they cannot harm others, including children.

¶ 80 Given the circumstances of this case, defendant's background, and his virtually zero risk to recidivate, we hold that his lifetime subjection to the sex offender statutes is grossly disproportionate to his crime. As applied to him, lifetime subjection to the sex offender statutes' registration requirements and restrictions violates the Illinois Constitution's proportional penalties clause and the United States Constitution's eighth amendment.

¶ 81 In its petition for rehearing, the State argues that we should narrowly tailor our decision and uphold or modify some, if not all, SORA restrictions on defendant. Instead of deeming SORA's restrictions unconstitutional as applied to defendant, the State claims (for the first time in its petition) that we should shorten the term of defendant's subjection to SORA or determine the individual restrictions to which defendant may be constitutionally subjected. We reject the State's argument and deny its petition. Prior to the petition for rehearing, the State took an "all or nothing" approach. Parties may not raise arguments for the first time in a petition for rehearing. Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017); *People v. Grigorov*, 2017 IL App (1st) 143274, ¶ 23. The issue presented on appeal was whether SORA's restrictions, as a whole, constitute disproportionate punishment as applied to defendant.

¶ 82                                                      CONCLUSION

¶ 83 For the foregoing reasons, we affirm defendant's conviction, jail sentence, and probation term. We vacate defendant's subjection to the sex offender statutes' registration requirements and restrictions.

¶ 84 Affirmed in part, reversed in part.

¶ 85 JUSTICE WRIGHT, concurring in part and dissenting in part:

¶ 86 I concur with the resolution of the issues addressed by the majority, with the exception of the holding regarding the adequacy of this record to address a constitutional challenge and the majority's determination that SORA, the Notification Law, and four other challenged sex offender laws are punitive. I also disagree that these sex offender laws, as applied, are

unconstitutional.

¶ 87                                    I. Insufficient Record

¶ 88        It is well established that "an as-applied constitutional challenge is dependent on the particular circumstances and facts of the individual defendant or petitioner. Therefore, it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." *People v. Thompson*, 2015 IL 118151, ¶ 37. Here, the record does not contain any findings of fact for our consideration. Consequently, I disagree that this court should make our own findings of fact in order to reach the merits of defendant's constitutional challenge to SORA, the Notification Law, and four other sex offender laws. I conclude the record is insufficient to fairly resolve this constitutional issue.

¶ 89                        II. The Punitive Nature of SORA, the Notification Law,
                                        and the Sex Offender Laws

¶ 90        Assuming the majority is correct and the record is sufficient to consider defendant's as-applied challenge under *People v. Cleary*, 2013 IL App (3d) 110610, ¶ 35, I cannot concur with the majority's hazy holding that SORA, the Notification Law, and other sex offender laws at issue have become punitive. I note the majority's holding is directly contrary to existing precedent from our court. In *People v. Grochocki*, 343 Ill. App. 3d 664 (2003), after a thorough analysis, this court held that the Notification Law, as amended after the decision in *Malchow*, is not punitive in either legislative purpose or effect. See *People v. Malchow*, 193 Ill. 2d 413 (2000). More recently, the First District also determined the most recent legislative changes to SORA, as of 2016, "reflect social changes and do not manifest a punitive bent." *In re A.C.*, 2016 IL App (1st) 153047, ¶ 77. I agree with the rationale of these two well-reasoned decisions.

¶ 91        In 2013, our supreme court stated, "To begin with, it is worth repeating that sex offender registration is not punishment." *People v. Cardona*, 2013 IL 114076, ¶ 24. Based on this observation, I conclude well-established precedent from our supreme court should control the outcome of this appeal. *Malchow*, 193 Ill. 2d at 424; *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 207 (2009); *In re J.W.*, 204 Ill. 2d 50, 75 (2003); *People v. Adams*, 144 Ill. 2d 381, 386-90 (1991). Therefore, based on this existing precedent, I disagree with the majority's conclusion that SORA, the Notification Law, and other sex offender laws at issue are punitive as applied to defendant.

¶ 92                    III. Eighth Amendment and the Proportionate Penalties Clause

¶ 93        I do not share the majority's conclusions concerning defendant's challenge based on the eighth amendment and the proportionate penalties clause of the Illinois Constitution. These contentions must be resolved by considering objective criteria, including the gravity of the offense, the harshness of the penalty, and the sentences imposed on other criminals in the same jurisdiction. *Solem v. Helm*, 463 U.S. 277, 291-92 (1983). In spite of the majority's argument, a proportionality analysis does not require that courts analyze the severity of certain crimes purely based on their numerical classification. See *id.*

¶ 94        I am not troubled by the fact that defendant's conviction for a Class 2 felony subjects this defendant to the same classifications and obligations as sex offenders convicted of Class 1 or

Class X felonies. I believe defendant's crime, regardless of its classification, remains disturbingly serious.

¶ 95    The majority minimizes the seriousness by noting defendant had a "relationship" with the victim that began when the victim posted her photo on MeetMe, a site restricted to adults only. These observations seem to unfairly shame or blame the victim and are not persuasive. Familiarity makes it easier to convince underage victims to cooperate with unlawful sex acts, making violence unnecessary. The fact that defendant was not a stranger to the victim and did not violently assault the victim does not diminish the gravity of the offense in my view.

¶ 96    I also disagree with the majority's statement that defendant's "lifetime subjection to sex offender laws is grossly disproportionate to [defendant's] crime." Not every act of criminal sexual abuse will result in the pregnancy of a minor. Certainly, any restrictions or inconvenience to this defendant, arising from the application of the sex offender laws at issue, pales in comparison to the life-altering and permanent changes the teenaged victim experienced. Here, the victim experienced nine months of pregnancy during high school, child birth, and the reality that she would be responsible for another life for the rest of her life.

¶ 97    Respectfully, I do not find laws that restrict this defendant from working within 500 feet of a school or public park, or within 100 feet of a school bus stop particularly disproportionate to this offense. The record does not indicate defendant is a student, will be a student, or has any reason to be present near a school. I also find it reassuring that this convicted sex offender must disclose his e-mail addresses, cyber identities, and instant message accounts as part of the registration requirements set forth in the sex offender laws. These restrictions, and others, will protect underage targets that defendant might attempt to win over with his sweet-talking, manipulative communications in the future.

¶ 98    The requirement that defendant must notify law enforcement when he is away from home for three or more days does not appear to be burdensome to this defendant. The record does not contain any information that defendant travels frequently or is away from his residence for days at a time. Based on this record, I do not agree the regulations and restrictions defendant claims are unconstitutional in effect actually create any permanent disability for this defendant. He may still travel about, have a social life, have access to the Internet, find employment, and maintain appropriate sexual relationships with other adults.

¶ 99    Lastly, due to the paucity of the facts of record directly pertaining to the circumstances of this defendant, it is impossible for a reviewing court to accurately predict this defendant's risk to reoffend. Simply stated, this record does not support the conclusion that defendant is unlikely to reoffend.

¶ 100    Defendant's recidivist potential is evident in the circumstances of this offense. Once was not enough. Here, defendant repeatedly had sexual intercourse with a teenager on multiple occasions. In my view, defendant has already demonstrated his propensity to repeat the same criminal acts, again and again.

¶ 101    Respectfully, I observe that defendant's propensities did not go unnoticed by the trial court. After viewing defendant's demeanor during his recorded interview and his trial testimony, the trial court did *not* make a finding that defendant was unlikely to reoffend in the future. Nonetheless, the majority reaches a conclusion that defendant will not reoffend, where the trial court did not make the same finding based on the same information.

¶ 102    Finally, the sex offender evaluation in this record reveals defendant engaged in "a purposeful attempt to deceive the examiner." The evaluator also expressed concerns that defendant had a "tendency to not disclose information," and provided "erratic and inconsistent physiological responses" to several relevant questions. Surely, if defendant was not at risk to repeat this criminal misconduct, sex offender treatment would not be recommended in this case. Based on this record, I conclude defendant's eighth amendment and proportionality challenge under the Illinois Constitution are meritless because the consequences of his criminal conduct did not exceed the gravity of this offense.

¶ 103                                    IV. Summary

¶ 104    To summarize, I dissent because I believe this court should not address the constitutional issue at this time due to the incomplete record submitted to our court. Next, even if the record is sufficient to evaluate defendant's constitutional claim, existing precedent from this court and other courts, requires our court to conclude that SORA, the Notification Law, and the sex offender laws are not punitive. Finally, I reject the notion that the punishment defendant received is disproportionate to the gravity of his crime and conclude the record does not conclusively establish that this defendant will not reoffend when the opportunity arises.

¶ 105    Consequently, I concur in part and dissent in part.