# Illinois Official Reports

## Appellate Court

---

### *People v. Kochevar*, 2020 IL App (3d) 140660-B

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEVIN M. KOCHEVAR, Defendant-Appellant. |
| District & No. | Third District<br>No. 3-14-0660 |
| Filed | February 4, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Whiteside County, No. 13-CM-121; the Hon. Michael R. Albert, Judge, presiding. |
| Judgment | Appeal dismissed in part; affirmed. |
| Counsel on Appeal | James E. Chadd, Peter A. Carusona, and Emily A. Koza, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Terry A. Costello, State's Attorney, of Morrison (Patrick Delfino, David J. Robinson, and Gary F. Gnidovec, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE LYTTON delivered the judgment of the court, with opinion.<br>Justice Carter concurred in the judgment and opinion.<br>Justice McDade concurred in part and dissented in part, with opinion. |

**OPINION**

¶ 1        Defendant, Devin M. Kochevar, was charged by information with one count of criminal sexual abuse (720 ILCS 5/11-1.50(c) (West 2012)). He filed a motion to suppress the statement he made during a custodial interview with regard to the alleged abuse, which was denied. The case was tried before a jury, and Kochevar was found guilty. In the court's written order, he was sentenced to serve 90 days of jail time with all but 10 days suspended and 24 months of probation, and he was required to register as a sex offender, undergo sex offender treatment and aftercare, provide a DNA sample, and pay a variety of fines and fees. He appealed, challenging the denial of his motion to suppress his custodial statement as involuntarily procured and seeking reversal of his conviction and new proceedings. Kochevar later sought and was given leave to bring an as-applied constitutional challenge to the Sex Offender Registration Act (SORA) (730 ILCS 150/1 *et seq.* (West 2012)). In our opinion, we vacated the portion of Kochevar's sentence requiring him to register as a sex offender and remanded the case to the circuit court. The State filed a petition for leave to appeal in the supreme court. That petition was denied, and the court issued the following supervisory order:

> "In the exercise of this Court's supervisory authority, the Appellate Court, Third District, is directed to vacate its judgment in *People v. Kochevar*, case No. 3-14-0660 (08/20/18). The appellate court is directed to consider the effect of this Court's opinion in *People v. Bingham*, 2018 IL 122008, on the issue of the constitutionality of sex offender statutes as applied to defendant, and to determine if a different result is warranted." *People v. Kochevar*, No. 124006 (Ill. Jan. 31, 2019) (supervisory order).

Pursuant to that directive, we now vacate our earlier judgment (2018 IL App (3d) 140660) and consider whether *People v. Bingham*, 2018 IL 122008, compels us to reach a different result.

¶ 2                                              I. BACKGROUND

¶ 3        There is no report of proceedings of either the suppression hearing or the trial in the record. There is also no written order documenting the trial court's decision on the motion to suppress, but there is a docket entry. There is no written order explaining the trial court's finding that Kochevar's statement was voluntary and denying the motion to suppress. An "Agreed Statement of Facts" and a "Supplemental Agreed Statement of Facts" were filed to supplement the common-law record. The balance of the record consists of a one-volume common-law record, which includes a sexual assessment, the two-part document signed by Kochevar, and his birth certificate. The following facts were derived from those documents and the parties' briefs.

¶ 4        Kochevar and C.R. had been acquainted for several years through their participation in track at Prophetstown High School. In 2012, when Kochevar was 16 (nearly 17) and C.R. was 14, the relationship grew closer. After Kochevar turned 18, their relationship became sexual. On March 16, 2013, upon learning of this relationship and the couple's alleged sexual activities the preceding night, C.R.'s parents called the police.

¶ 5        Two days later, Chief Michael Fisk and Sergeant Bruce Franks of the Prophetstown Police Department went to the high school and met with Kochevar in the school office. The officers asked him to go with them to the police station to give a statement regarding his relationship

with C.R. Kochevar readily agreed and was driven to the station, uncuffed, in Franks's marked police car.

¶ 6    Once there, Kochevar was escorted directly to an interview room and was questioned by Franks and Fisk. After about 20 minutes, Kochevar gave an oral statement. He then agreed to prepare a written statement, which he composed and signed while alone in the interview room. Thereafter, the interview apparently resumed in the form of a series of written questions set out at the end of Kochevar's signed statement. He answered those questions in writing and signed them. Neither part of the document was prepared or signed under oath. This two-part document reads as follows:

"Right around a year ago, C.R. & I started talking. We were friends & neither one of us thought anything more would come of it. But C.R. & I talked a lot & started to like each other. When this first started I was 17 and she was 15. Or maybe I was about a month or so over 17. Either way, it was a two year difference. But C.R. & I would have never been aloud [*sic*] to see each other because a little over a year ago, me & some of my friends threw eggs at her house & her sister's car because we didn't like her. Honestly, I regret that. It was a mistake I had to learn from. My car was egged & then I knew how it felt & it made me feel worse about it. But anyways, that's why we wouldn't be aloud [*sic*] to be friends or anything like that. But neither one of us cared, we wanted to see each other so we made it work. Occasionaly [*sic*] C.R. would sneak out to see me. Sometimes we would just drive around & other times we would go to my house. Our relationship didn't start out sexual. Honestly for the longest time we did no more than kiss. But eventually that changed & things became more than that. Yes, we did have sex, I won't deny that. But never did I force her. No matter how bad I wanted to do anything, I didn't do it unless she wanted to too. I'm not that kind of guy. Even after this I wouldn't say that I'm a 'bad guy.' Sure I make mistakes, I'm human but I think I'm an alright guy. I mean I always go to school, I get good grades. I'm a 3 sport athlete who excels in all of them. I've accepted an offer from Monmouth College to play basketball & run track for them on a scholarship. I actually plan to major in business and music so I can open up a place for kids, singers, or bands to come record music. That's my big plan. If I had to say one more thing about myself, I guess I would mention [*signature at end of first page*] Drake. Drake is a young man on the Comanche track team. Drake throws shot & runs the short sprints. Drake isn't good at those things but he gives it his all. So one meet last year after I had one [*sic*] the fastest heat of the 200, I asked the official if I could run it again. This time with Drake. He shook my hand & smiled then told me I could. So I ran that second 200. I ran it right behind Drake. I ran it and I lost. To a kid in a wheelchair. Drake competes with able bodied athletes even though he has never walked. Winning wasn't something he had experienced. So I cried my eyes out as I ran that race with him. It broke my heart. I talked with Drake & his parents & I ended up coming to another one of his meets & running with him again. To this day he & I remain friends. We always will be. But I'm not trying to sell anyone a sob story or convince you that I'm perfect. I wouldn't be writing this if that was the case. I understand how my relationship with C.R. was wrong. I understand why her parents are extremely upset. I would probably feel about the same way they do. Maybe they will get to read this & maybe they won't but I want to say that I'm sorry. I'm sorry for the past we have had & I'm sorry for this. But I can't say I wish it never

happened. There is a big spot for that girl in my heart & I think there always will be. We have so much in common its [*sic*] crazy. Yes, she is a little younger than me, but we still click. Will I end up with C.R.? Who knows, maybe & maybe not. Obviously some people might not like that but as long as she is happy, I'm happy. If she never wants to speak to me again or even wants to wait & see what happens when she is 18, I'm okay with whatever. As long as she is happy. I'm very sorry that any of this ever had to happen. I should have used my head more. But like I said, I'm only human. So hopefully this can all get worked out as easily as possible so we [*signature at end of second page*] can move forward with our lives & get back on track. Thank you for taking the time to read what I had to say about this matter. I appreciate it. Sincerely, [*signature at end of handwritten statement*].

> Q. HOW OLD IS C*** R***?
>
> A. 15
>
> Q. HOW MANY TIMES HAVE YOU HAD SEX WITH C*** R*** AT AGE 17?
>
> A. 0
>
> Q. HOW MANY TIMES AT AGE 18 DID YOU HAVE SEX WITH C*** R***?
>
> A. 20-30 times maybe
>
> Q. WHEN IS THE LAST TIME YOU HAD SEX WITH C*** R*** ?
>
> A. 3/15/13
>
> Q. WHERE DID THE SEX OCCUR THE LAST TIME?
>
> A. My house (320 Woodlawn Drive)
>
> Q. DID YOU EVER FORCE HER TO HAVE SEX?
>
> A. No
>
> Q. DID YOU GIVE HER ALCOHOL OR DRUGS FOR SEX?
>
> A. No
>
> Q. DID YOU VIOLATE ANY LAW WITH YOUR RELATIONSHIP WITH C*** R***, IF SO WHAT LAW?
>
> A. I don't think I did mainly because she was all for it & we didn't drink or do drugs or anything like that. But the age thing plays a part.
>
> [*signature at end of questions*]"

After Kochevar signed the last part of the document, the officers took him back to school.

¶ 7    About three weeks later, on April 13, 2013, Kochevar was charged by information with one count of misdemeanor criminal sexual abuse. The count alleged that on March 15, 2013, he committed an act of sexual penetration with C.R., who was at least 13 but under 17 years of age and that he was less than 5 years older than C.R.

¶ 8    Kochevar filed a motion to suppress his custodial statement, arguing that it was made involuntarily. He claimed that, during the interview, Franks and Fisk, both of whom he had known personally since boyhood, repeatedly told him that "they already knew the truth," that he "had to" give a statement before he left the station, and that the state's attorney would go easy on him if he admitted the truth in a written statement. Through counsel, he asserted that the officers exploited their personal relationships with him to secure the statement.

¶ 9    A hearing was held on the motion. Kochevar testified that, prior to the police interview, he was informed of his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)), orally and in

writing on a preprinted rights waiver form. He signed the preprinted form and did not ask to leave or for an attorney at any time during the interview. He testified that he had no difficulty understanding the officers' questions during the interview and that he had not been upset or crying. He stated that his academic performance at school was typical and that he did not have any learning disabilities or other intellectual impairments. He initially asserted that the interview lasted for "over an hour" but later amended that, saying it could have been less than an hour because when he was returned to school classes were still in session and it was still daylight. The record confirms that he was, in fact, at the station for about an hour.

¶ 10 Kochevar further testified that he knew Franks and Fisk personally. He had known Fisk, who was a family friend, since childhood. Franks had coached him in youth football and baseball and was also a friend of his father. He viewed the officers as people he was friendly with and he trusted. He opined that both officers spoke to him in a friendly manner and not "like cops." They did not speak aggressively, use profanity, or raise their voices. He affirmed that no physical coercion was used during the interview but testified that one of the officers told him he "had to" give a statement before he left. They gave him the impression that his giving a statement would cause the State to "take it easy" on him.

¶ 11 Kochevar testified that he told the officers that he had sex with C.R. but that he had done nothing wrong. He said that he insisted during the interview—as he did at the hearing—that it was all consensual. He confirmed that he was alone when he wrote the statement that the State submitted as evidence during the suppression hearing.

¶ 12 Franks and Fisk also testified. They both confirmed that Kochevar was brought to the station, was informed of his *Miranda* rights, signed the *Miranda* rights waiver, and then promptly admitted to having had consensual sex with C.R. Franks stated Kochevar gave no sign of knowing what the officers wanted to talk about when they met him at the school. He denied promising the State would be lenient with him if Kochevar gave them a written statement but acknowledged telling him that he "needed to" make a statement before he left. Franks denied having a "mentor" relationship with or being particularly close to Kochevar. He did, however, confirm that he had been his coach for youth sports and opined that it would be fair to say that they were "friends." The record is silent as to any testimony of Fisk confirming or denying the claimed relationship with Kochevar.

¶ 13 The trial court ultimately denied Kochevar's motion to suppress, finding that (1) his waiver of his *Miranda* rights was knowing and voluntary and (2) the officers' prior relationships with Kochevar did not place them in such a position of trust and authority so as to render their influence over Kochevar coercive.

¶ 14 The matter proceeded to a jury trial. The State called only two witnesses, Sergeant Franks and C.R. Kochevar made a continuing objection to the introduction of evidence of or concerning his verbal and written statements on the grounds set forth in the motion to suppress. Franks testified about the events leading up to Kochevar's interview and the subsequent charges. His testimony included a recitation of what occurred during Kochevar's interview and was substantially similar in all salient respects to what he gave during the suppression hearing. Kochevar's handwritten statement with his answers to the additional tacked-on questions and his signed *Miranda* waiver were entered into evidence.

¶ 15 C.R. testified that on the night of March 15, 2013, she had sex with Kochevar. At the time, she was 15 years old, and he was 18. Kochevar's birth certificate, documenting his birth on

September 27, 1994, was admitted into evidence. The State rested. Kochevar's motion for a directed verdict was denied, and the defense rested.

¶ 16    The jury found Kochevar guilty of one count of criminal sexual abuse. The trial court denied his motion for a new trial, which had alleged, among other issues, that his interview statement was involuntary and should have been suppressed. He was sentenced to 24 months' probation and required to register as a sex offender and undergo sex offender treatment and aftercare.

¶ 17                                II. ANALYSIS
¶ 18                     A. Voluntariness of Custodial Statements
¶ 19    Kochevar initially argues on appeal that the trial court erred in not suppressing his custodial statements because they were involuntarily given. He asserts that he had a long-standing personal relationship with each of the officers that led him to trust that they would treat him fairly but that they did not. Rather, he claims, they used that trust, his youth, and his lack of any experience with the criminal justice system to create a deceptively benign environment that, together with a promise of leniency and a failure to tell him what was criminal about his conduct, coerced his involuntary, unwitting admission to an undisclosed, undefined crime.

¶ 20    The State counters that the trial court was correct in finding that the interview, even with the existence of any personal relationships, was not coercive and the statement should not be suppressed. It points out that throughout the encounter the officers did not act in an intimidating or abusive manner or use any coercive physical tactics. The State further argues that Kochevar, who was 18 years old at the time of the interview, possessed the intelligence and education to understand the nature and purpose of his presence at the station, to make a rational decision to waive his *Miranda* rights, and to deny wrongdoing with respect to C.R.

¶ 21    At all times throughout the hearing on a motion to suppress a challenged statement, the State bears the burden of proof, but there is a shifting burden of production. Once the State has made a *prima facie* showing that the statement was voluntary, the burden shifts to the defendant to present some evidence that it was involuntary. *People v. Richardson*, 234 Ill. 2d 233, 254 (2009). If he does so, it remains for the State to prove by a preponderance of the evidence, considered in the light most favorable to the defendant (*People v. Tanser*, 75 Ill. App. 3d 482, 486 (1979) (citing *People v. Ruegger*, 32 Ill. App. 3d 765, 771 (1975))), that the statement was, in fact, voluntary. *Richardson*, 234 Ill. 2d at 254.

¶ 22    On review, a trial court's factual findings following a hearing on a motion to suppress a defendant's inculpatory statement will not be disturbed unless they are against the manifest weight of the evidence. *People v. Murdock*, 2012 IL 112362, ¶ 29. However, its ultimate ruling on whether the statement was made voluntarily is reviewed *de novo*. *Id.*

¶ 23    The basic test for determining whether a statement is voluntary was set out by the supreme court in *People v. Prim*, 53 Ill. 2d 62, 70 (1972), as follows:
        "Whether a statement is voluntarily given depends upon the totality of the circumstances. The test is whether it has been made freely, voluntarily and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed. [Citation.] In making its decision the trial court need not be convinced beyond a reasonable doubt, and the finding of the trial court that the

statement was voluntary will not be disturbed unless it is contrary to the manifest weight of the evidence."

¶ 24    In more recent decisions, our supreme court has given us a more specific set of factors to consider in assessing the voluntariness of a statement/confession. These include (1) the presence of *Miranda* warnings; (2) the defendant's personal characteristics including his age, intelligence, background, experience, education, mental capacity, and physical condition at the time of questioning; (3) the legality and duration of the detention and questioning; (4) the conditions of detention; and (5) whether any threats, promises, deception, guilt, or other coercive tactics were used in inducing the confession. *People v. Slater*, 228 Ill. 2d 137, 160 (2008); *People v. Gilliam*, 172 Ill. 2d 484, 500-01 (1996); *People v. Martin*, 102 Ill. 2d 412, 426-27 (1984). In the instant case, Kochevar relies on the fifth factor.

¶ 25    The record shows, and the parties agree, that at the time of the interview Kochevar was an 18-year-old high school senior of average or better intelligence. He was given *Miranda* warnings orally and in writing, and he does not deny waiving those rights by signing the preprinted waiver form. In addition, he and the officers agree that he did not cry or otherwise exhibit any emotional distress during the interview. Kochevar does not claim that the officers at any time used abusive, profane, or intimidating language or physical tactics in an effort to elicit an inculpatory statement or that they denied him his rights to an attorney, to remain silent, or to end the interview. To the contrary, he was brought to the police station voluntarily and free of handcuffs. He described the conduct of the officers as friendly and "not like cops." The interview lasted less than an hour, and he was returned to school before the end of classes. The State points out that these concessions would normally support a finding that there was no coercion and that the challenged statements were voluntary.

¶ 26    Kochevar, however, claims an entirely different form of coercion. He argues that he was subtly coerced by a combination of promises, omissions, and deception on the part of people with whom he had personal relationships and whom he trusted to deal with him fairly. He claims a combination of factors, along with his youth and unfamiliarity with the criminal justice system, allowed the officers to extort statements from him that were incriminating and inculpatory. Kochevar argues that the same factors relied on by the State actually prove his claim of coercion.

¶ 27    As our supreme court has stated, "the relationship of an interrogator to a party being questioned is a relevant consideration in assessing a statement's voluntariness." *People v. Wipfler*, 68 Ill. 2d 158, 173 (1977). The court made it clear, however, that voluntariness depends on the totality of the circumstances. *Id.* at 172-73. Other relevant factors to be weighed include the alleged promise of leniency; the exhortation to tell the truth; the alleged failure to define the crime being investigated; the "friendliness" of the officers during interrogations; and youth, unfamiliarity, and lack of experience with the criminal justice system. See *id.* at 174.

¶ 28    Viewing the totality of the evidence in the light most favorable to Kochevar, it seems likely that the incriminating portions of Kochevar's written statement were given to earn leniency allegedly promised by persons he trusted and believed and not as a knowing admission, willingly given, of criminal wrongdoing. We understand that the overall circumstances may well have misled Kochevar about the gravity of the conduct to which he was admitting; however, we cannot find on this record that the conduct of the officers was coercive or that Kochevar's confession was coerced.

¶ 29    We also note that the confession was unnecessary to Kochevar's conviction and that any questions about the manner in which it was secured are essentially irrelevant. All that is necessary to sustain Kochevar's conviction is his acknowledgement that he had a sexual encounter with C.R. when he was 18 and she was 15. See 720 ILCS 5/11-1.50(c) (West 2012). That information was true, was provided freely to Franks and Fisk during the interview and in Kochevar's written statement, and was proven at trial through the testimony of C.R. and the admission of Kochevar's birth certificate.

¶ 30    Kochevar's challenge to his conviction on the grounds that his custodial statement was procured coercively and involuntary fails.

### B. As-Applied Constitutional Challenge

¶ 32    In compliance with the supreme court's supervisory order in this case, we now consider whether the opinion in *Bingham*, 2018 IL 122008, requires a different result than the one we earlier reached with respect to Kochevar's as-applied constitutional challenge to SORA.

¶ 33    In *Bingham*, our supreme court stated: "[A] reviewing court has no power on direct appeal of a criminal conviction to order that defendant be relieved of the obligation to register as a sex offender." *Id.* ¶ 18. This is because the obligation to register and other restrictions imposed by SORA are collateral consequences of a conviction and not part of the judgment under review. *Id.* ¶¶ 16-21. According to our supreme court, challenges to SORA may be pursued only in two circumstances: (1) on direct appeal in a case finding a defendant guilty of violating a SORA requirement or (2) by pursuing a constitutional claim in a civil suit. *Id.* ¶ 21.

¶ 34    Neither circumstance applies here. Kochevar raised an as-applied constitutional challenge to SORA on appeal from his sexual abuse conviction. Pursuant to *Bingham*, we lack jurisdiction to consider such a challenge. See *id.* ¶ 18.

¶ 35    While differences exist between this case and *Bingham*, we do not believe that they are substantial enough to outweigh *Bingham*'s broad prohibition precluding review of SORA constitutional challenges. Thus, we must dismiss Kochevar's as-applied constitutional challenge for lack of jurisdiction.

### III. CONCLUSION

¶ 37    For the foregoing reasons, the portion of defendant's appeal challenging the constitutionality of SORA is dismissed. In all other respects, the judgment of the circuit court of Whiteside County is affirmed.

¶ 38    Appeal dismissed in part; affirmed.

¶ 39    JUSTICE McDADE, concurring in part and dissenting in part:

¶ 40    I agree with the decision of the majority to affirm the trial court's finding that Kochevar's confession was not coerced. Because of the factual and procedural posture of this case, I do not agree that we are prohibited by *Bingham* from a review of Kochevar's as-applied constitutional challenge.

¶ 41    There are two broad reasons why I do not believe the preclusion set out in *Bingham* mandates dismissal of as-applied constitutional challenges in every case or in this case specifically. The first derives from the *Bingham* decision itself. The entirety of the decision is

an analysis of four conceptual components of the specific appeal under consideration, seemingly to ascertain whether the issue had been sufficiently litigated in the trial court to permit meaningful appellate review. The court thoroughly assessed each of the components. This analysis would have been a wholly useless and meaningless exercise if the court's only purpose was to announce a blanket prohibition of any review of any and all as-applied constitutional challenges raised for the first time on appeal. Instead, the analysis appears to be a roadmap for making that determination on a case-by-case basis. The second reason is the issuance and directive of the supervisory order. If *Bingham* were indeed the blanket prohibition the court's "conclusion" seems to imply, there would be no point in requiring the appellate court "to consider the effect of [the *Bingham* opinion] on the issue of the constitutionality of the sex offender statutes as applied to defendant" or "to determine if a different result is warranted." The court would have simply reversed our decision outright. It did not do so.

¶ 42    For the reasons that follow, I would find that it was appropriate to reach the merits of Kochevar's claim and that our original decision in this case was correct and should stand. In that regard, I would also note that the original opinion in this case was a unanimous decision of this panel. The dissent that follows tracks that earlier analysis, and I have every reason to believe that it would be the same unanimous decision if we all read *Bingham*'s impact as a roadmap and not as a blanket prohibition of all as-applied challenges or all as-applied SORA challenges raised for the first time on appeal.

¶ 43    The first step in my analysis is comparing the legal footprints of the two cases based on the four conceptual components of the *Bingham* decision, which found (1) the sex offender registration did not relate in any way to defendant's conviction and sentence in the circuit court, (2) the defendant's obligation to register was not imposed by the trial court, (3) the obligation to register was not "punishment" imposed by the trial court, and (4) absent the constitutional challenge being raised in the trial court, there was no opportunity for detailed development of the facts necessary to consider the issue.

¶ 44    First, the *Bingham* appeal, unlike our case, involved a retroactive obligation to register. Bingham's sex offense had occurred prior to the adoption of the legislation creating SORA. It was his conviction of a completely unrelated felony that triggered his obligation to register, and it is his appeal from that unrelated conviction in which his challenge was raised. Because of this fact, the supreme court noted that "[t]he requirement that defendant register as a sex offender is not encompassed within the judgment or any order of the trial court." *Id.* ¶ 17. That is clearly not the procedural posture here. Kochevar was charged with and convicted of the sexual offense that was the sole basis for his obligation to register, and his appeal was taken in that case. While his initial notice of appeal challenged only the sufficiency of the evidence upon which he was convicted, he was granted leave, after issuance of the now-vacated decision in *People v. Tetter*, 2018 IL App (3d) 150243, to add the constitutional issue, which was the subject of full supplemental briefing prior to the issuance of our original opinion.

¶ 45    Second, in *Bingham* the trial court's judgment was devoid of any reference to a requirement to register as a sex offender, nor would such a requirement even be contemplated following a conviction of felony theft. By contrast, the trial court in the instant case, as required by state statute, expressly included within its orders the requirement that Kochevar register as a sex offender. Specifically, we note the original and amended "Order Granting Probation (Sex Offenses)." These are preprinted form orders declaring and certifying, pursuant to "Chapter

730, Act 150, Illinois Compiled Statutes," that the named defendant is a "sex offender" and his victim was 15 years old. Paragraph 19 of that order provides:

> "The defendant shall comply with the terms and conditions of the Sex Offender Registration Act as required by Chapter 730, Act 150, Illinois Compiled Statutes. Failing to register or violating the Sex Offender Registration Act in any manner may result in a violation of this term of probation. [A handwritten addition to this paragraph says 'defendant shall register under the names Johnson and Kochevar.'] (Emphasis in original)."

These orders require a consequence related to and dependent on the judgment of conviction entered by the trial court. I note that this same general basis was used by the First District to find its decision in *People v. Rodriguez*, 2018 IL App (1st) 151938-B, was not prohibited by *Bingham*.

¶ 46    The third factor considered in *Bingham* concerns Illinois Supreme Court Rule 615(b)'s authorization that a reviewing court may "reduce the *punishment* imposed by the trial court." (Emphasis added.) Ill. S. Ct. R. 615(b)(4) (eff. Jan. 1, 1967). Under existing precedent the requirement to register does not impose "punishment" but rather is a mere collateral consequence. In almost all sex offender cases, this factor would be dispositive in favor of dismissal of Kochevar's constitutional claim. However, I believe there is an exception applicable in this case, which I discuss below.

¶ 47    Finally, in *Bingham*, the supreme court expressed its concern about the lack of opportunity for development of "detailed factual findings" if there is not a civil case or other evidentiary proceeding in the trial court. In the instant case, Kochevar argues that the facts of the crime of which he was convicted were so benign, as sex offenses go, that the nature and duration of the restrictions quite simply outstrip the relative severity of the offense. As to Kochevar's claim, the criminal trial itself constitutes a fact-finding proceeding—one that is documented by factual statements agreed upon by the parties. Although several documents on which the court would customarily rely are not part of the record, there is nonetheless enough to yield facts sufficient to assess Kochevar's claims.

¶ 48    In this comparison of the two cases, the factual differences related to the first and fourth factors are significant and, standing alone, should permit review. The problem for Kochevar lies with the second (arguably) and third factors and their common denominator—the "collateral consequences" classification. It is that designation that prevents the trial court's written directive that Kochevar register as a sex offender from being an obligation "imposed by" the court and precludes the obligation from being "punishment" imposed by the court. The significance of this fact in this case is that the entire thrust of Kochevar's constitutional challenge is his argument for a change in the law—a change that recognizes that, in the evolution of the SORA statutory scheme, the modifications have transformed something that started out as a benign civil protection system into a draconian, oppressive, and life-altering process—and a finding that registration is now punishment rather than a collateral consequence. Put differently, the legal change he seeks is from the very classification that *Bingham* has found precludes his appeal in this case. Given that and the other major distinctions identified between the two cases, I believe this appeal is a proper vehicle for presenting his claim and that a result different from that in *Bingham* is warranted. Accordingly, I would reach the merits of Kochevar's as-applied constitutional challenge.

¶ 49        Finally, I briefly address the majority's reliance on the supreme court's directive that "challenges to SORA may be pursued only in two circumstances: (1) on direct appeal in a case finding a defendant guilty of violating a SORA requirement or (2) by pursuing a constitutional claim in a civil suit." *Supra* ¶ 33 (citing *Bingham*, 2018 IL 122008, ¶ 21). I believe this case is unique in that the defendant is specifically challenging the continued appropriateness and viability of the supreme court's prior holdings that the SORA statutes are not punishment but are instead collateral consequences. That specific challenge seems to beg consideration in the case in which, unlike *Bingham*, the punishment/consequence was actually imposed. Moreover, given the particular posture of this case, compelling Kochevar to either violate the statute and risk extending his requirements for an additional 10 years or incur the expense and delay of filing a new civil action seems to violate at least the spirit of enhancing access to justice. So, again, I would reach the merits in this appeal.

¶ 50        Kochevar's constitutional challenge alleges the "Illinois statutory scheme of penalties that apply to a convicted sex offender, including community notification, and, *inter alia*, restrictions on movement and employment are unconstitutional as applied to him." He cites the following offending statutes: SORA (730 ILCS 150/1 *et seq.* (West 2016)), the Sex Offender Community Notification Law (Notification Law) (730 ILCS 152/101 *et seq.* (West 2016)), section 11-9.3 of the Criminal Code of 2012 (720 ILCS 5/11-9.3 (West 2016)), section 5-5-3(*o*) of the Unified Code of Corrections (730 ILCS 5/5-5-3(*o*) (West 2016)), and section 21-101 of the Code of Civil Procedure (735 ILCS 5/21-101 (West 2016)).

¶ 51        Kochevar's as-applied challenge rests on two arguments: first, that the restrictions constitute punishment and their application to him renders that punishment grossly disproportionate to the severity of the crime in violation of the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) and, second, that the restrictions constitute a "penalty" and their application to him violates the clause of the Illinois Constitution requiring "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship" (Ill. Const. 1970, art. I, § 11).

¶ 52        Of course, the major obstacle to Kochevar's requested relief is the firm position of our supreme court that the statutes in question do not constitute punishment. The State has cited and discussed the supreme court's decisions and the conforming decisions of all of the appellate districts in great detail, but its recitation was unnecessary—we are well aware of the line of cases including *People v. Adams*, 144 Ill. 2d 381, 387-89 (1991), in which the court held that the restrictions of SORA are not punishment but rather are merely collateral consequences of a conviction for covered sexual offenses, and *People v. Malchow*, 193 Ill. 2d 413 (2000), in which the court reaffirmed the sex offender laws are not punishment, and others listed and unlisted in the State's recital. See also 720 ILCS 5/11-9.4-1(b) (West 2016). The thrust of Kochevar's appeal is his argument for reconsideration, in light of numerous changes in the statutory SORA scheme since its fairly benign inception, of the classification of its registration obligation as a collateral consequence. The *raison d'etre* of this appeal is his argument for that change in that law.

¶ 53        The supreme court could not have made its position clearer. The SORA statutes do not constitute punishment or penalty. And yet offenders who live under SORA restrictions continue to be confronted with what certainly feels and operates as to them like punishment. I acknowledge the heavy weight of supreme court precedent and still urge reconsideration and a different result in light of more recent statutory changes. I am mindful of the deference due

the legislature's enactment of laws, and I recognize that the sex offender statutory scheme has been developed to address legitimate and important state concerns.

¶ 54 It is, however, also true that the checks and balances built into our state and federal constitutions require the courts to evaluate and reevaluate challenged legislation to ascertain when or if it runs afoul of federal and state constitutional rights and protections. See *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 165 (1963) (" '[i]f society is disturbed by civil commotion *** these safeguards need, and should receive, the watchful care of those entrusted with the guardianship of the Constitution and laws' " (quoting *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 124 (1866))). That duty is triggered in a situation such as this, in which a claim has been raised that statutes deemed civil and regulatory appear to have evolved and become " 'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.' " *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997) (quoting *United States v. Ward*, 448 U.S. 242, 248-49 (1980)). More specifically in this case, Kochevar claims that changes to the original legislative system have converted a once-benign registration requirement with strictly limited dissemination to one of sweeping reach and harsh punitive consequences. To assist in evaluating such claims, the *Mendoza-Martinez* court set out the following multiple-factor test for determining whether civil regulation is or has evolved into punishment: (1) whether the sanction involves affirmative disability or restraint, (2) whether it has been historically regarded as punishment, (3) whether its operation will promote the traditional aims of punishment, (4) whether the sanction is rationally related to an alternative, nonpunitive purpose, and (5) whether it appears excessive in relation to the alternative, nonpunitive purpose. *Mendoza-Martinez*, 372 U.S. at 168-69; *Smith v. Doe*, 538 U.S. 84, 97 (2003). When those factors are applied to the sex offender statutory scheme at issue here, there are strong indications that the scheme has become penal. Having and intending to convey no disrespect to either the supreme court or to the legislature, the supporting arguments for a change in the law are set out below.

¶ 55                                                          A. Defendant

¶ 56 The analysis begins by considering who Kochevar was at the time he committed and was convicted for his offense. This information is derived from the custodial statement quoted earlier in the majority decision. He was a senior at Prophetstown High School whose positive academic and athletic performances earned him admission to Monmouth College and an athletic scholarship to play basketball and run track. He said of his academics, "I always go to school, I get good grades." He planned to study business and music in college, and his "big plan" for his life was to "open up a place for kids, singers, or bands to come record music."

¶ 57 He described himself as "a 3 sport athlete who excels in all of them." Included in his narrative was the description of an act of kindness, repeated on one later occasion, toward a physically handicapped teammate, which resulted in a friendship. He did not, however, gloss over his shortcomings, candidly admitting joining with some friends to throw eggs at the house and car of C.R.'s sister because they "didn't like her." In a self-centered, teenage way, he regretted that action when his own car was egged at a later time—in part because he thought it contributed to C.R.'s parents' dislike of him and because experiencing it "made [him] feel worse about it."

¶ 58 Kochevar's relationship with C.R., as he described it, began as a friendship. He was 16, almost 17, and she was 14 when its character began to develop romantic overtones. Their first

sexual encounter occurred when he had turned 18 and she was 15. He described his feelings for her ("there is a big spot in my heart for that girl and I think there always will be") and expressed a hope that perhaps when she was 18 and could make her own decisions they would be able to get together. He said his relationship with C.R. was "wrong," and he understood why her parents were upset. However, he denied any knowledge that his actions were criminal, and there is no indication in the record that he possessed any criminal intent.

¶ 59    In response to a direct written question: "Did you violate any law with your relationship with C.R. and, if so what law?" his response was "I don't think I did mainly because she was all for it and we didn't drink or do drugs or anything like that. But the age thing plays a part." I would note that the additional questions appended to his narrative statement would cause any person of average intelligence to suspect that age might have been a factor in whatever had brought him to the police station.

¶ 60    The record in this case does not reveal a "sex offender who targets children" or a "sexual predator." It should be noted, however, that he has acknowledged and rationalized continuing attempts to see C.R. after he was charged and in violation of no contact orders. What the record does show is a typical teenager—brash, occasionally rash, with soft spots and spurts of poor, but largely harmless, judgment—generally living life much like other teens. He was graduating from high school, going off to college on scholarship, full of potential and plans when he was removed from this relative homogeneity, charged, convicted, and sentenced for criminal sexual abuse. As a mandatory part of his sentence of probation, he was and is required to register as a sex offender.

¶ 61                                    B. Effect of Statute

¶ 62    Because he was 18 years old at the time of his offense, certain benefits, which would have been applicable to him had he acted six to seven months earlier, are unavailable. He is arguably (and the State in fact makes this argument) not entitled to the sentencing considerations afforded younger offenders by the United States Supreme Court in *Miller v. Alabama*, 567 U.S. 460 (2012). Nor can he benefit from a juvenile's entitlement to more limited dissemination of his status as a convicted sex offender. 730 ILCS 152/121 (West 2016). Instead a few keystrokes on any Internet browser will bring up Kochevar's name, his picture, the name and citation of his offense, and the fact of his conviction on the Illinois sex offender website. *Id.* § 120(c), (d). Upon inputting his name on the national website, a searcher will be referred to the State's more informative site. His status as a sex offender is thus broadcast to the world, and he faces a lifetime of employment rejection, public disdain, impairment of his enjoyment of parental involvement and his discharge of parental responsibilities, curtailment of his liberty to live where he chooses and to move freely about his community, suspicion, and permanent stigma. His life as he knew it was over.

¶ 63    Kochevar notes that the public data on the website and additional information of a much more personal nature are required to be maintained by the Illinois State Police in the Statewide Sex Offender Database (*id.* § 115) and that the local sheriff is required to disclose that information to numerous community groups whose duties and services relate to children. These include school boards, libraries, childcare facilities, public housing agencies, the Department of Children and Family Services, and volunteer organizations. *Id.* § 120(a). The information may also be given to members of the public who request it. *Id.* § 120(c).

¶ 64    It is not clear to me that he would be allowed to take advantage of his scholarship to Monmouth College because his probation order specifies that "under no circumstances" is he permitted to reside outside of Whiteside County before completing two years of sex offender treatment. Monmouth College is in Knox County. But wherever he attends college, he is required to register with both local law enforcement and the school's public safety or security director; those people must be notified each and every time he competes in an out-of-town track meet or basketball tournament over a long weekend, goes on an extended trip with friends, or is otherwise absent from his residential community for three or more days. 730 ILCS 150/3 (West 2016); see also *People v. Pearse*, 2017 IL 121072. Any slip-up with these notification obligations automatically extends his registration requirement by another 10 years. 730 ILCS 150/7 (West 2016).

¶ 65    Any contact with children (or even his mere presence in their general vicinity) is rigidly circumscribed. Beyond the negative impacts if he ultimately has children of his own or has friends or family members with children, this particular restriction would effectively foreclose, or at the least postpone, his "big plan" to provide and run a recording studio for "kids, singers or bands."

¶ 66    This does not purport to be an exhaustive or comprehensive list of either the registration or notification obligations applicable to Kochevar but is merely a sampling of the restrictions imposed on him because of his conviction. And, as noted above, although his registration term is 10 years, any failure of strict compliance with the numerous technical registration and notification requirements results in an automatic extension for another 10 years. *Id.* Misunderstanding any of the myriad rules, inadvertence, even hospitalization when a deadline arrives, or a new notification requirement being allegedly incurred (see *Pearse*, 2017 IL 121072) can extend a 10-year registration, one term at a time, to a lifetime obligation.

¶ 67            C. Application of the *Mendoza-Martinez* Factors to Kochevar's Facts

¶ 68    A careful, thorough, and thoughtful retrospective of sex offender registration and notification cases in the Illinois and federal courts results in what I believe to be a compelling argument that modifications in the implementation and reach of the registration itself and the increasingly burdensome and debilitating restrictions of the legislative program have gradually, but inexorably, transformed rationally based, protective consequences into a statutory scheme that is indeed punitive. Using the five-factor test set out in *Mendoza-Martinez*, 372 U.S. at 168-69 (*supra* ¶ 54), the evolution of sex offender registry cases and the legislatively enacted registration, notification, and restriction regulations can be assessed to determine whether legislation intended to create a civil regulatory scheme has become "so punitive either in purpose or effect as to negate [the State's] intention to deem it civil." (Internal quotation marks omitted.) *Hendricks*, 521 U.S. at 361 (quoting *Ward*, 448 U.S. at 248-49). In the original opinion in this case, we adopted the analysis in *Tetter*, now vacated pursuant to supervisory order. In this dissent, I have essentially coopted portions of the analysis of the *Tetter* majority with the permission of its author, Justice Schmidt.

¶ 69    With regard to the first *Mendoza-Martinez* factor, in 2000 our supreme court found in *Malchow*, 193 Ill. 2d at 421, that the 1998 version of the Notification Law placed no affirmative disability or restraint on sex offenders. Similarly, the United States Supreme Court in *Smith*, 538 U.S. at 101, validated Alaska's sex offender registry law because it left sex offenders "free to move where they wish and to live and work as other citizens, with no supervision." Those

reasons were clearly correct at the time. However, in the years since those decisions were issued, the Illinois legislature has significantly increased the number, severity, and technicality of requirements and restrictions on sex offenders.

¶ 70　　Perhaps most importantly, the legislature imposed specific restrictions on where sex offenders may be present or live. See 720 ILCS 5/11-9.3 to 11-9.4-1 (West 2012). Sex offenders cannot have jobs in which they work, at any time for any reason, within 500 feet of a school or public park or within 100 feet of a school bus stop. *Id.* SORA also effectively bars offenders from working any job requiring extensive travel; sex offenders must notify, in person, both Illinois law enforcement and the destination's law enforcement when they are away from home for three or more days. 730 ILCS 150/3(a) (West 2012). The amendments since *Malchow* "directly restrict where [a sex offender] can live, work, and even move about his community." *People v. Avila-Briones*, 2015 IL App (1st) 132221, ¶ 51. Thus, Illinois now has very different and more restrictive statutes than those addressed in *Malchow* or *Smith*. In the time since the legislature began enacting statutes that affirmatively constrain a convicted sex offender's presence, residence, and liberty to move about society, the court has not actually and specifically addressed whether the sex offender statutes' punitive effects negate the legislature's expressed intent to deem the laws civil. See *Hendricks*, 521 U.S. at 361. For the reasons stated below, I would urge a finding that they do.

¶ 71　　　　　　　　　　1. Affirmative Disability or Restraint

¶ 72　　Neither *Malchow* nor *Smith* found that Illinois's 1998 Notification Law and Alaska's SORA, respectively, affirmatively disabled or restrained registered sex offenders. The more recent amendments to the sex offender statutes are now strikingly akin to probation or supervised release, both of which are considered punishment. *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) ("Probation is simply one point (or, more accurately, one set of points) on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service."). Indeed, for Kochevar, registration and compliance were mandatory conditions of his probation.

¶ 73　　Non-sex-offender parolees are subject to parole conditions. Parolees must, among other conditions, not break the law in any jurisdiction; not possess a firearm or dangerous weapon; report to an agent of the Illinois Department of Corrections (DOC); permit a DOC agent to visit the parolee at home or place of employment; attend or reside in a facility established for the instruction or residence of persons on parole or mandatory supervised release (MSR); obtain the DOC's permission before leaving the state; obtain permission before changing residence or employment; consent to searches of the parolee's person, property, or residence; refrain from using narcotics and submit to urinalysis testing; not frequent places where controlled substances are illegally sold or used; not knowingly associate with others on MSR or parole; provide true and accurate information regarding the parolee's community integration and adjustment; and follow the parole agent's instructions. See 730 ILCS 5/3-3-7(a) (West 2016). Parolees may additionally be required to work, pursue education or vocational training, undergo treatment for medical issues or addiction, and/or support the parolee's dependents. *Id.* § 3-3-7(b).

¶ 74　　Sex offenders, like defendant, are subject to dozens of additional parole conditions. See *id.* §§ 3-3-7(a)(7.5) to (7.13), (b)(7.5) to (7.6), (b-1). These conditions include sex offender treatment, not living in the same residential unit (including apartments or condominiums) with

- 15 -

other known sex offenders, wearing an electronic monitoring device, not communicating with or contacting people on the Internet whom the offender believes to be under 18, consenting to searches of all devices with Internet access, not possessing prescription medications for erectile dysfunction, not "scrubbing" or erasing data on any computer device, residing only at an approved location, obtaining approval prior to accepting employment or pursuing education, not being employed or participating in any volunteer activity involving contact with children, refraining from entering designated geographic areas without approval, neither possessing nor having access to pornography or sexually stimulating material, not patronizing any adult entertainment establishment or telephone hotline, not residing near or being present in places where minors may congregate without advance approval, taking an annual polygraph exam, maintaining a travel log, and other restrictions. See *id.*

¶ 75    Even after completing sex offender probation, offenders are subject to the sex offender statutes for either 10 years or life—Kochevar's misdemeanor conviction subjects him to registration for 10 years. Under the sex offender statutes, sex offenders who have completed their parole must register with the DOC, inform the DOC of certain life events (such as buying or using a new car, growing a beard, moving, or taking a vacation); must consent to having Internet usage monitored; and, importantly, must not live or be present near school zones, school bus stops, or public parks. Sex offenders who have completed their parole are more restricted in many ways than non-sex-offenders who remain on parole. While non-sex-offender parolees are monitored and prohibited from committing crimes, even off-parole sex offenders may not reside or be present near places where the legislature has deemed them more likely to recidivate. With few exceptions, these restrictions apply to all sex offenders regardless of the nature of their offense and the likelihood of reoffending.

¶ 76    Sex offender statutes restrict where Kochevar may live, work, or be present, in addition to the numerous obstacles imposed by the registration requirements. These requirements and restrictions, collectively, constitute an affirmative disability and restraint—defendant is restricted in most aspects of his daily life. Specifically, "safe zones" surrounding schools, school bus stops, and public parks significantly limit defendant's lawful movement within the community. These zones restrict where he may live, drive, work, visit, or attend any social function for life. Although not to the same degree as prison, the sex offender statutes' restrictions affirmatively disable and restrain offenders such as defendant. Therefore, this factor suggests that the sex offender statutes constitute punishment.

¶ 77                              2. History and Tradition as Punishment

¶ 78    The *Smith* majority found that the version of Alaska's SORA in effect in 2003 did not resemble a historically recognized form of punishment—it merely disseminated accurate, already-public information. *Smith*, 538 U.S. at 97-99. More recently, the Sixth Circuit Court of Appeals has found Michigan's Sex Offender Registration Act (Michigan's SORA) (Mich. Comp. Laws § 28.723 *et seq.* (2012)) does meet "the general definition of punishment, has much in common with banishment and public shaming, and has a number of similarities to parole/probation." *Does #1-5 v. Snyder*, 834 F.3d 696, 703 (6th Cir. 2016), *cert. denied*, 583 U.S. ___, 138 S. Ct. 55 (2017). The *Snyder* court primarily focused on Michigan's SORA's 1000-foot school safety zone restriction; sex offenders were not allowed to live, work, or "loiter" within 1000 feet of any school. *Id.* at 698, 702. The court found this restriction punitive, concluding that it drastically hindered offenders' ability to live in or move about society. *Id.* at

702. The court also found that Michigan's SORA went far beyond publishing already-public information, like Alaska's SORA in *Smith*. *Id.* Instead, Michigan's SORA set forth a nonappealable "byzantine code" in which "the ignominy *** flows not only from the past offense, but also from the statute itself." *Id.* at 697, 703.

¶ 79     Illinois's current sex offender statutes are more similar to Michigan's SORA addressed in *Snyder* than Alaska's SORA considered in *Smith* or our own 1998 Notification Law reviewed in *Malchow*. Arguably, our current sex offender statutes are more restrictive than Michigan's SORA deemed punishment in *Snyder*. Although Michigan's SORA imposed larger school safety zones than our sex offender statutes (1000 feet as opposed to 500 feet), our sex offender statutes impose a 500-foot zone around public parks and a 100-foot zone around school bus stops that Michigan's SORA did not impose. Michigan's SORA also did not "prohibit the registrant from setting foot in the school zones." *Id.* at 701. Our sex offender statutes do. 720 ILCS 5/11-9.3, 11-9.4-1 (West 2016).

¶ 80     Our sex offender statutes satisfy the traditional definition of punishment. Citing published legal philosophy, the *Snyder* court defined "punishment" as involving pain or unpleasant consequences following from an offense against the law, applying to the offender, being intentionally administered by people other than the offender, and being imposed and administered by an authority constituted by a legal system against which the offense was committed. *Snyder*, 834 F.3d at 701 (citing H.L.A. Hart, *Punishment and Responsibility in* Essays in the Philosophy of Law 4-5 (1968)). Our sex offender statutes, like parole or MSR, satisfy this definition. I would contend that this factor also suggests that the sex offender statutes constitute punishment.

¶ 81                                 3. Traditional Aims of Punishment

¶ 82     The traditional aims of punishment are incapacitation, retribution, and deterrence. Our legislature implemented the sex offender statutes to deter future sex crimes and protect the public. If the sex offender statutes are not meant or do not operate to deter sex crimes, then they do not protect the public at all. As the United States Supreme Court noted in *Smith*, however, civil regulations can deter crime: "To hold that the mere presence of a deterrent purpose renders such sanctions criminal *** would severely undermine the Government's ability to engage in effective regulation." (Internal quotation marks omitted.) *Smith*, 538 U.S. at 102. A statute that deters crime is not necessarily punitive.

¶ 83     Our sex offender statutes, however, do not merely deter recidivism; they incapacitate convicted sex offenders and serve as retribution for having committed sex crimes. The sex offender statutes' residence and presence restrictions, at work or otherwise, incapacitate sex offenders by banning them from places where children routinely congregate. Restricting offenders' liberty of residence and movement, as well as monitoring their daily lives solely because of certain convictions, emits a strong scent of retribution, for better or worse. In sum, our sex offender statutes satisfy all three traditional aims of punishment. I would conclude that this factor strongly suggests that the sex offender statutes constitute punishment.

¶ 84             4. Rational Relation to a Nonpunitive Purpose and 5. Excessive Application

¶ 85     The final two *Mendoza-Martinez* factors relevant to sex crimes can be effectively assessed in tandem. These factors instruct us to determine whether the sex offender statutes' restrictions are rationally related to their nonpunitive purpose of protecting the public and, if so, whether

the application of the sex offender statutes is excessive with respect to serving its nonpunitive purpose.

¶ 86    *Smith* held that Alaska's SORA, which was limited to identifying offenders, was rationally related to protecting the public from sex offenders, a nonpunitive regulatory purpose, primarily due to the high risk of recidivism. *Id.* at 102-04. The Court cited research on child molesters, which noted a high recidivism rate and concluded that most offenders reoffend more than a few years after their prison terms, sometimes as many as 20 years after release. *Id.* at 104. The Court also found the application of Alaska's SORA to be reasonable in light of its nonpunitive objective. *Id.* at 103-04.

¶ 87    In his concurrence, Justice Souter questioned whether Alaska's SORA's excessive or indiscriminate application undermined its nonpunitive purpose. He observed that not all sex offenders threaten public safety and, "when a legislature uses prior convictions to impose burdens that outpace the law's stated civil aims, there is room for serious argument that the ulterior purpose is to revisit past crimes, not prevent future ones." *Id.* at 109 (Souter, J., concurring in the judgment).

¶ 88    Here, even if the sex offender statutes are rationally related to a nonpunitive purpose, their broad application and harsh liberty restrictions extend far beyond the purpose's purview. To determine whether a statute's application is excessive with respect to its nonpunitive purpose, "[t]he question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Id.* at 105 (majority opinion). In light of its nonpunitive purpose, protecting the public from dangerous sex offenders, the sex offender statutes' scope and substance is unreasonably punitive.

¶ 89    Our current sex offender statutes, unlike Alaska's SORA in *Smith* or our own Notification Law in *Malchow*, restrict the liberty of movement in society of all sex offenders, not just dangerous ones. Although we must not question "whether the legislature has made the best choice possible to address the problem it seeks to remedy" (*id.*), we must recognize, as did the *Smith* majority, that restricting one's liberty of movement in the community is drastically different than merely disseminating information. See *id.* at 101.

¶ 90    Sex offender statutes with broad undifferentiated application also greatly exceed their nonpunitive purpose. The *Snyder* court found that indiscriminate restrictions on sex offenders' residence or presence in certain areas have, "at best, no impact on recidivism" because Michigan's SORA made "no provision for individualized assessments of proclivities or dangerousness, even though the danger to children posed by some *** is doubtless far less than that posed by a serial child molester." *Snyder*, 834 F.3d at 704-05. Likewise, the scope and restrictions of Illinois's sex offender statutes substantially outpace their public safety objective. Illinois individually evaluates sex offenders (including defendant) to determine their risk to recidivate, yet the application of the sex offender statutes does not take these individual evaluations into account.

¶ 91    There is no effort to determine if a particular offender is a person at whom the purposes and restrictions of SORA ought to be directed. Its statutes are not tailored to regulate only dangerous offenders, those likely to recidivate, or those with little or no potential for rehabilitation; therefore, offenders like defendant must endure the statutes' restrictions without society reaping any benefit. These statutes go well beyond the dissemination of accurate, already-public information and are not "analogous to a visit to an official archive of criminal records." *Smith*, 538 U.S. at 99.

¶ 92 Moreover, the sex offender statutes' application is irrevocable. Were that not the case, this analysis might be different. See *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 203 (2009) (finding that a juvenile offender's ability to petition for termination after five years was indicative of a nonpunitive restriction). In a similar case, New Hampshire's supreme court fashioned a remedy whereby sex offenders were entitled to periodic hearings, subject to judicial review, to determine whether they still posed a danger to society. *Doe v. State*, 111 A.3d 1077, 1101-02 (N.H. 2015). Such opportunities for sex offenders to be liberated from the sex offender statutes' strictures would better reflect a nonpunitive regulatory scheme rather than extended and enhanced punishment for a crime.

¶ 93 In sum, I am persuaded that consideration of the impact of Illinois's sex offender registration laws in light of the five *Mendoza-Martinez* factors compels a conclusion that our sex offender statutory scheme has morphed from civil regulation into something that is indeed punitive. The analytical correctness of this conclusion is strengthened when the statutory restrictions are applied to Kochevar and their necessity is assessed in light of his offense and his individual characteristics. Sex offender statutes do constitute punishment because they fall within the "continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service." *Griffin*, 483 U.S. at 874. Several of our sister states have found similar statutes to be punitive (see *Doe v. Department of Public Safety & Correctional Services*, 62 A.3d 123 (Md. 2013); *Gonzalez v. State*, 980 N.E.2d 312, 321 (Ind. 2013); *Starkey v. Oklahoma Department of Corrections*, 2013 OK 43, 305 P.3d 1004; *State v. Letalien*, 2009 ME 130, 985 A.2d 4; *State v. Williams*, 129 Ohio St. 344, 2011-Ohio-3374, 952 N.E.2d 1108; *Commonwealth v. Baker*, 295 S.W.3d 437 (Ky. 2009)).

¶ 94 Proceeding on the conviction that Kochevar's subjection to the sex offender restrictions is indeed punishment, I turn to his claims that this punishment is both excessive and disproportionate as to him. The prism through which this assessment is viewed is generally the same under the eighth amendment to the United States Constitution and the proportionate penalties clause of our state constitution. *People v. McDonald*, 168 Ill. 2d 420, 455 (1995). The eighth amendment, in addition to prohibiting punishment that is cruel and unusual, also forbids "extreme sentences that are grossly disproportionate to the crime." (Internal quotation marks omitted.) *Graham v. Florida*, 560 U.S. 48, 60 (2010). Whether that standard has been met is examined considering the totality of the circumstances and applying the following three-factor test: (1) does the gravity of the offense comport with the harshness of the penalty, (2) are more serious crimes subject to the same or a less serious penalty, and (3) do other jurisdictions have the same punishments for the same crime? *Solem v. Helm*, 463 U.S. 277, 290-92 (1983).

¶ 95 The proportionate penalties clause in our state constitution requires that penalties be proportionate to the nature of the offense. Ill. Const. 1970, art. I, § 11. A sentence may be found unconstitutionally disproportionate if (1) the penalty is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community or (2) offenses with identical elements are given different sentences. *People v. Sharpe*, 216 Ill. 2d 481, 521 (2005). The reality of the sex offender registration and notification strictures is that, under most of the regulations, the same penalties are imposed upon conviction of a sex offense involving a minor without consideration of whether it is an act of "consensual" teen sex or persistent and predatory sexual conduct; the second alternative does not apply. Accordingly, I

consider Kochevar's claim to determine whether, as to him, the penalties in the statute are so wholly disproportionate as to shock the moral conscience of the community.

¶ 96 In beginning this analysis, I want to stress that I do not diminish the gravity of Kochevar's crime. I do, however, believe that its degree of seriousness, relative to other sex offenses that do include the targeted risks, is suggested by two facts: first, its classification by the legislature as a Class A misdemeanor—the least serious of the covered offenses—and, second, that the sentence imposed by the court was 90 days in the Whiteside County jail, with 80 of those days suspended, and a 24-month term of probation. By contrast with that sentence and under any reasonable standard of comparison, the pervasive negative impact of the sex offender restrictions is genuinely shocking in this case.

¶ 97 Of paramount importance, there is nothing in the record that suggests that this young man targeted children, targeted underage girls, or even targeted C.R. According to the record, based on Kochevar's statements, he and C.R. were engaged in a friendship that evolved over time into a relationship that was sexual. He was not a predator. With regard to his individual risk assessment, forensic psychologist Kirk Witherspoon conducted a psychological evaluation prior to sentencing and concluded in his final report that there was no evidence of sexual deviance and the likelihood of reoffending was termed "low-to-moderate." Kochevar reported to Witherspoon that, other than C.R., all of his sexual partners have been his age or older. There is nothing in his personal record or in the record on appeal that suggests that the rigid technical strictures of the sex offender statutes are necessary to restrain child-predatory instincts or predilections that Kochevar gives no evidence of having now or ever having had. The imposition of the restrictions is punitive, and because it is unnecessary in order to secure Kochevar's compliance with the statutes' expressed purpose of preventing abuse of children, it is grossly disproportionate to his crime and violates the eighth amendment to the United States Constitution.

¶ 98 Further, that the severe punitive impact on Kochevar constitutes a penalty subject to evaluation under the proportionate penalties clause seems clear to me. This was a young man who the record shows had worked hard to excel academically, athletically, and, most importantly, as a decent human being and was heading into a promising future. He was charged with and convicted of a sexual crime and removed from the typical teen pool. Now, after having served his sentence, he is tethered to that youthful mistake by a plethora of restrictions, some of which are effective for 10 years and others for the rest of his life. This system that the legislature has devised affirmatively obstructs the State's constitutional objective of restoring this particular offender to useful citizenship in violation of the proportionate penalties clause of the Illinois Constitution.

¶ 99 My final point is not legal in nature but, instead, is grounded in truth and common sense. Simply put, I have no doubt that there are presidents, other government officials, members of the clergy, doctors, judges, lawyers, teachers, CEOs of major corporations, even members of the Illinois General Assembly, male and female, who, as teenagers, engaged in the same consensual sexual conduct as Devin Kochevar. They are now leaders and pillars of their communities who know they never posed any greater threat to children than he does; who have risen to their present positions unhampered by the stigma of SORA, which under our laws they, too, have earned; and who should look at this young man and acknowledge "there, but for the grace of God or family influence or plain dumb luck, go I."

¶ 100    For all of the foregoing reasons, I would find Illinois's statutory sex offender scheme is punishment and that, as applied to Kochevar, it violates both the eighth amendment to the United States Constitution and the proportionate penalties clause of the Illinois Constitution. Accordingly, I believe that, if the supreme court agreed with this analysis, the appropriate result would be to affirm Kochevar's conviction, jail sentence, and his two-year term of probation but without the sex offender conditions of that probation, including vacating the requirement that he register as a sex offender and comply with SORA (730 ILCS 150/1 *et seq.* (West 2016)), the Notification Law (730 ILCS 152/101 *et seq.* (West 2016)), section 11-9.3 of the Criminal Code of 2012 (720 ILCS 5/11-9.3 (West 2016)), section 5-5-3(*o*) of the Unified Code of Corrections (730 ILCS 5/5-5-3(*o*) (West 2016)), and section 21-101 of the Code of Civil Procedure (735 ILCS 5/21-101 (West 2016)).